1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

JOSEPH H. HUNT
Assistant Attorney General
MARCIA BERMAN
Assistant Director, Federal Programs Branch
ALEXANDER V. SVERDLOV
  (New York Bar No. 4918793)
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Tel. (202) 305-8550
alexander.v.sverdlov@usdoj.gov

*Attorneys for Defendants*

## IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF WASHINGTON
### AT SPOKANE

STATE OF WASHINGTON,

        Plaintiff,

   v.

BETSY DEVOS, *et al.,*

        Defendants.

Case No. 2:20-cv-00182-TOR

**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Hearing Date:  July 11, 2020
Time:  1:00 PM
Place:  Telephonic
Judge:  Honorable Thomas O. Rice

1
2
**TABLE OF CONTENTS**
3
INTRODUCTION ..................................................................................................1

BACKGROUND ...................................................................................................3

I.    STATUTORY BACKGROUND.....................................................................3

    A.    Title IV of the Higher Education Act .........................................................3

    B.    The CARES Act..........................................................................................4

II.   THE DEPARTMENT'S IMPLEMENTATION OF § 18004 THUS FAR ...........6

III.  PROCEDURAL HISTORY..........................................................................9

ARGUMENT ......................................................................................................10

I.    WASHINGTON IS UNLIKELY TO SUCCEED ON THE MERITS BECAUSE ITS
    CHALLENGE IS PREMATURE.................................................................10

II.   WASHINGTON IS UNLIKELY TO SUCCEED BECAUSE AT LEAST A PORTION
    OF THE RELIEF IT SEEKS IS BARRED BY OTHER STATUTES ...............15

III.  WASHINGTON IS ALSO UNLIKELY TO SUCCEED ON THE MERITS BECAUSE
    IT MISREADS THE CARES ACT AND RELATED STATUTORY PROVISIONS........17

    A.  The CARES Act Delegates Significant Authority to the Secretary, Making
        Rulemaking Appropriate............................................................................17

    B.  The Department's Preliminary Exercise of its Authority is Neither Arbitrary nor
        Capricious .................................................................................................21

    C.  Washington's Constitutional Claims are Unlikely To Succeed...................25

IV.  WASHINGTON HAS NOT ESTABLISHED THAT IT IS LIKELY TO SUFFER
    IRREPARABLE HARM ABSENT AN INJUNCTION .....................................26

V.   THE REMAINING EQUITABLE FACTORS WEIGH AGAINST PLAINTIFF.............28

CONCLUSION...................................................................................................29

1

## <u>TABLE OF AUTHORITIES</u>

2

**Cases**

3

*Abbott Labs. v. Gardner,*

4
    387 U.S. 136 (1967) ........................................................................................ 10

5
*All. for the Wild Rockies v. Cottrell,*

6
    632 F.3d 1127 (9th Cir. 2011) ................................................................... 24, 26

7
*Ariz. Libertarian Party v. Reagan,*
    798 F.3d 723 (9th Cir. 2015) ........................................................................ 11

8

9
*Ass'n of Am. Med. Colls. v. United States,*
    217 F.3d 770 (9th Cir. 2000) ....................................................... 10, 11, 13

10
*Ass'n of Civilian Technicians v. Fed. Labor Relations Auth.,*

11
    370 F.3d 1214 (D.C. Cir. 2004) ................................................................... 19

12
*Barnes v. Berryhill,*

13
    895 F.3d 702 (9th Cir. 2018) ........................................................................ 22

14
*Bennett v. Spear,*

15
    520 U.S. 154 (1997) ............................................................................... 10, 11

16
*Boardman v. Pac. Seafood Grp.,*
    822 F.3d 1011 (9th Cir. 2016) ...................................................................... 24

17

18
*Brown v. Gardner,*
    513 U.S. 115 (1994) ...................................................................................... 16

19

20
*Charles v. Verhagen,*
    348 F.3d 601 (7th Cir. 2003) ........................................................................ 24

21
*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,*

22
    467 U.S. 837 (1984) ...................................................................................... 16

23
*Children's Hosp. of the King's Daughters, Inc. v. Price,*
    258 F. Supp. 3d 672 (E.D. Va. 2017) ........................................................... 12

24

25
*Cisneros v. Alpine Ridge Grp.,*
    508 U.S. 10 (1993) ........................................................................................ 15

26
*City & Cty. of S.F. v. Trump,*

27
    897 F.3d 1225 (9th Cir. 2018) ...................................................................... 23

28

*City of Los Angeles v. Barr,*
  941 F.3d 931 (9th Cir. 2019) ................................................................ 19, 20

*Ctr. for Biological Diversity v. Esper,*
  --- F.3d ---, 2020 WL 2182175 n.7 (9th Cir. 2020) .................................... 22

*Dep't of Revenue v. ACF Indus.,*
  510 U.S. 332 (1994) ............................................................................... 20

*Drakes Bay Oyster Co. v. Jewell,*
  747 F.3d 1073 (9th Cir. 2014) ............................................................... 26

*DTCC Data Repository (U.S.) LLC v. CFTC,*
  25 F. Supp. 3d 9 (D.D.C. 2014) ............................................................. 12

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.,*
  529 U.S. 120 (2000) ............................................................................... 16

*Franklin v. Massachusetts,*
  505 U.S. 788 (1992) ............................................................................... 11

*Golden & Zimmerman, LLC v. Domenech,*
  599 F.3d 426 (4th Cir. 2010) ................................................................. 11

*Gonzales v. Oregon,*
  546 U.S. 243 (2006) .......................................................................... 18, 19

*Ill. Nat'l Guard v. FLRA,*
  854 F.2d 1396 (D.C. Cir. 1988) ............................................................. 14

*Indep. Equip. Dealers Ass'n v. E.P.A.,*
  372 F.3d 420 (D.C. Cir. 2004) ............................................................... 10

*Karnoski v. Trump,*
  926 F.3d 1180 (9th Cir. 2019) .............................................................. 9, 15

*Kisor v. Wilkie,*
  139 S. Ct. 2400 (2019) ........................................................................... 22

*Lopez v. Brewer,*
  680 F.3d 1068 (9th Cir. 2012) ................................................................. 9

*Lujan v. Nat'l Wildlife Fed.,*
  497 U.S. 871 (1990) ............................................................................... 10

*McFarland v. Kempthorne,*
  545 F.3d 1106 (9th Cir. 2008) ............................................................... 19

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983)...................................................................................... 19

*Munaf v. Geren*,
  553 U.S. 674 (2008)...................................................................................... 9

*N.J. Air Nat'l Guard v. FLRA*,
  677 F.2d 276 (3d. Cir. 1981).................................................................. 14, 15

*Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs.*,
  545 U.S. 967 (2005).................................................................................. 16, 18

*Nat'l Fed'n of Indep. Bus. v. Sebelius (NFIB)*,
  567 U.S. 519 (2012)...................................................................................... 23

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
  538 U.S. 803 (2003).................................................................................. 10, 13

*New York v. United States*,
  505 U.S. 144 (1992)...................................................................................... 24

*Northcoast Envtl. Ctr. v. Glickman*,
  136 F.3d 660 (9th Cir. 1998) ...................................................................... 10

*NRDC v. EPA*,
  706 F.3d 428 (D.C. Cir. 2013) .................................................................... 12

*Pimentel v. Dreyfus*,
  670 F.3d 1096 (9th Cir. 2012) .................................................................... 14

*Price v. Stevedoring Servs.*,
  697 F.3d 820 (9th Cir. 2012) ...................................................................... 22

*Sierra Club v. Trump*,
  379 F. Supp. 3d 883 (N.D. Cal. 2019) .......................................... 24, 25, 26

*Skidmore v. Swift*,
  323 U.S. 134 (1944)...................................................................................... 22

*Skyline Wesleyan Church v. Cal. Dep't of Managed Health Care*,
  --- F.3d ---, 2020 WL 2464926 (9th Cir. 2020) ........................................ 12

*Stormans, Inc. v. Selecky*,
  586 F.3d 1109 (9th Cir. 2009) .................................................................... 11

*Sutton v. United Air Lines, Inc.*,
  527 U.S. 471 (1999).................................................................................. 18, 19

*Texas v. United States,*
  523 U.S. 296 (1998) ............................................................................................ 10

*U.S. Dep't of the Navy v. Fed. Labor Relations Auth.,*
  665 F.3d 1339 (D.C. Cir. 2012) ......................................................................... 19

*Winter v. Nat. Res. Def. Council,*
  555 U.S. 7 (2008) ........................................................................................... 9, 24

**Statutes**

5 U.S.C. § 701 ..................................................................................................... 1

8 U.S.C. § 1373 ................................................................................................. 23

8 U.S.C. § 1611 ...................................................................................... 5, 8, 13

8 U.S.C. § 1611(a) ............................................................................................ 13

8 U.S.C. § 1621(c)(3) ....................................................................................... 14

8 U.S.C. § 1641 ................................................................................................. 15

8 U.S.C. § 1641(b) ........................................................................................... 20

20 U.S.C. § 1070(a) ........................................................................................... 3

20 U.S.C. § 1070a .............................................................................................. 3

20 U.S.C. § 1087*ll* ....................................................................................... 3, 17

20 U.S.C. § 1091 ................................................................................................ 7

20 U.S.C. § 1091(a) ........................................................................................... 3

20 U.S.C. § 1094(a) ........................................................................................... 4

20 U.S.C. § 1221e-3 ......................................................................................... 18

20 U.S.C. § 1001 ................................................................................................ 4

Pub. L. No. 89-329, 79 Stat. 1219 (1965) ......................................................... 2

Pub. L. 105–306, 112 Stat. 2926 ..................................................................... 15

Pub. L. 105–33, 111 Stat. 638 ......................................................................... 15

Pub. L. No. 104-193, 110 Stat. 2260 ................................................................. 1

Pub. L. No. 116-136, 134 Stat. 281 (2020).................................................................... *passim*

**Regulations**

34 C.F.R. § 668.14(b)(16)................................................................................. 4, 21

34 C.F.R. § 676.20............................................................................................... 4

85 Fed. Reg. 11,056 (Feb. 26, 2020) ............................................................. 6, 11

**Legislative Materials**

H.R. 6800, 116 Cong. § 150110(a)(1)-(2) (2020)......................................... 5, 18

1

## **INTRODUCTION**

At the end of March, as the unprecedented impacts of the coronavirus pandemic began coming into focus, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (CARES Act), Pub. L. No. 116-136, 134 Stat. 281 (2020), to address the mounting public health and economic crises. Among its many provisions, the CARES Act created a $14.2 billion appropriation of emergency funding, called the Higher Education Emergency Relief Fund (HEERF), and enlisted the U.S. Department of Education and Secretary of Education Betsy DeVos to distribute money from the fund to institutions of higher education (IHE) across the country. Within weeks, the Department had calculated the amount of HEERF funds to be allocated to each institution and issued preliminary guidance on various aspects of the aid distribution process. In an effort to get money to the institutions as quickly as possible, the Department began distributing this money even while it continued to consider what rules should govern the process.

That rulemaking process remains ongoing. But plaintiff, the State of Washington (Washington), has decided not to see the process play out. Rather than see what rule the Department ultimately promulgates, Washington has rushed to Court challenging preliminary guidance that the Department posted on its website on April 21, 2020, less than a month after the CARES Act was enacted. That guidance—which is non-binding, and which the Department has now explicitly stated does not carry the force and effect of law—reflects the Department's preliminary views on a number of issues concerning its ongoing implementation of the Act. But dissatisfied with the direction of the Department's thinking, Washington asks this Court to enjoin the portion of the guidance in which the Department expressed its view that emergency financial aid grants contemplated by § 18004(c) of the CARES Act should be governed by the general criteria established in Title IV of the Higher Education Act of 1965 (HEA).

Washington is not entitled to this extraordinary remedy. As an initial matter, its claims are unripe; the Department has made clear that its rulemaking process remains on going, and that it cannot, and will not, enforce the current guidance against any IHE. There is, currently, no

final agency action for the Court to review, and nothing impeding Washington institutions from distributing their portion of the HEERF money in ways that contravene the guidance. Under these circumstances, an injunction would be an unnecessary and an improper intrusion into an agency's ongoing rulemaking process, and should be rejected on that basis alone.

Further, despite Washington's efforts to paint the Department's guidance as improper overreach, the state's claims amount to nothing more than a challenge to the Department's interpretation of statutory language—albeit an interpretation that has not been set forth in any final agency action properly subject to review under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706. Contrary to what Washington claims, there are clear indicia in the text of § 18004(c), and elsewhere in the CARES Act, that Congress had the Title IV framework in mind when designing methods to provide supplemental emergency financial aid grants to help students manage expenses related to the disruption of campus operations. There is, at the very least, a good basis for the Department to explore the extent of the connection between § 18004(c) and Title IV requirements through rulemaking, as it is currently doing—and more than enough support in the statute for the preliminary guidance the Department provided thus far.

Meanwhile, the harm Washington claims is fundamentally attributable to the upheaval caused by the coronavirus pandemic—not the isolated, non-binding guidance by the Department. An injunction would not forestall that harm, especially given that Washington remains free to disregard the guidance. But an injunction *would* profoundly harm the Department and the public interest by cutting short administrative deliberations on an important and time-sensitive matter, and enshrining Washington's preferred—and demonstrably mistaken—reading of the CARES Act.

Accordingly, Washington's request for a preliminary injunction should be denied.

# BACKGROUND

## I.    STATUTORY BACKGROUND

### A.    Title IV of the Higher Education Act

Congress passed the HEERF provisions of the CARES Act against the backdrop of the HEA.  The HEA, as amended, Pub. L. No. 89-329, 79 Stat. 1219 (1965), is a comprehensive statutory scheme under which the federal government supports eligible institutions of higher education and their students.  Title IV of the HEA, devoted to student assistance, is intended "to assist in making available the benefits of postsecondary education to eligible students . . . in institutions of higher education," including by providing for payments to States and assistance to IHEs themselves. 20 U.S.C. § 1070(a).  Title IV thus includes the major federal student financial aid programs such as Pell Grants, 20 U.S.C. § 1070a; federal work-study programs, *id.* §§ 1087-51 to -58; and a system of federal loans to students and parents, *id.* §§ 1087a-1087ii.

Although any particular Title IV program may have specific eligibility criteria, Title IV sets forth certain general eligibility requirements for students, including that a student (1) "be enrolled or accepted for enrollment in a degree, certificate, or other program . . . leading to a recognized educational credential" at an eligible IHE and "not be enrolled in an elementary or secondary school"; (2) if presently enrolled, "be maintaining satisfactory progress in the[ir] course of study"; (3) "not owe a refund on [Title IV] grants previously received . . . or be in default on any [Title IV] loan"; (4) certify that any Title IV money received "will be used solely for expenses related to attendance or continued attendance" at their IHE, and provide their social security number; (5) be a United States citizen, national, or permanent resident, or be able to provide evidence "that he or she is in the United States for other than a temporary purpose of the intention of becoming a citizen or permanent resident"; and (6) have repaid any funds for which the student was convicted or pled nolo contendere or guilty to a crime involving fraud.  20 U.S.C. § 1091(a).  The Department uses the Free Application for Federal Student Aid (FAFSA) to assess students' satisfaction of Title IV's eligibility criteria and to calculate a student's financial need.  *See id.* § 1090.  Students filing a FAFSA must also include a statement of

educational purpose, stating that any Title IV funds received "will be used solely for expenses related to attendance or continued attendance" at the IHE. *Id.* § 1090(a)(4)(A). Need is calculated by subtracting the expected family contribution, together with the amount of assistance obtained elsewhere, from a student's "cost of attendance." *Id.* § 1087kk. Title IV sets forth a detailed definition of "cost of attendance" in 20 U.S.C. § 1087*ll*.

Title IV identifies annual and cumulative caps on the amount of aid a student can receive under each Title IV program. *E.g.*, 34 C.F.R. §§ 676.20, 685.203, 690.62. Proprietary schools participating in Title IV also must demonstrate that they derive at least ten percent of their revenue from sources other than Title IV. *See id.* §§ 668.14(b)(16), 668.28. Title IV also requires participating IHEs to enter into program participation agreements with the Department, which incorporate the Department's regulations and require the IHEs to, among other things, administer students' aid applications, determine students' eligibility for specific aid programs, maintain records necessary to administer the funds, and submit reports to the Secretary as the Secretary may require. 20 U.S.C. § 1094(a).

## B.    The CARES Act

On March 27, 2020, Congress passed the CARES Act to provide an unprecedented package of emergency economic assistance and other support to help people and various institutions cope with the enormous economic and public health crises triggered by the coronavirus pandemic. The President signed the CARES Act into law the same day. As part of the CARES Act, Congress appropriated $30.75 billion, to remain available through September 30, 2021, for the Department to allocate among governors, elementary and secondary schools, and IHEs and their students. Of that amount, the Act designates approximately $14.2 billion for the HEERF, to be allocated by the Secretary to higher education. CARES Act §§ 18001-18004.

The Act sets forth a formula by which the Department is to allocate ninety percent of the HEERF funding (approximately $12.8 billion) among "institutions of higher education," within the meaning of Title I of the HEA, 20 U.S.C. §§ 1001 *et seq.* CARES Act §§ 18004(a),

18007(2).[1]  Under this formula, seventy-five percent of an institution's allocation relies on its share of "full-time equivalent enrollment" ("FTE") of Federal Pell Grant recipients who were not exclusively enrolled in distance education courses prior to the coronavirus emergency, *id.* § 18004(a)(1)(A), while twenty-five percent relies on its share of FTE of non-Pell Grant recipients who were not exclusively enrolled in distance education courses prior to the coronavirus emergency, *id.* § 18004(a)(1)(B).  The Act specifies that the funds made available to each institution "shall be distributed by the Secretary using the same systems as the Secretary otherwise distributes funding to each institution under [HEA's] title IV." *Id.* § 18004(b).

Of particular relevance in this case, the Act requires that no less than fifty percent of HEERF funds received by an IHE under § 18004(a)(1) (the Student Aid Portion) be used "to provide emergency financial aid grants to students for expenses related to the disruption of campus operations due to coronavirus (including eligible expenses under a student's cost of attendance, such as food, housing, course materials, technology, health care, and child care)." *Id.* § 18004(c).  The Act leaves the terms "emergency financial aid grants" and "student" undefined.  An IHE may use the remaining amount of its § 18004(a)(1) allocation (the Institutional Portion) "to cover any costs associated with significant changes to the delivery of instruction due to the coronavirus." *Id.* (identifying exceptions not relevant here).

On May 15, 2020, the House of Representatives passed legislation, referred to as the "HEROES Act." *See* HEROES Act, H.R. 6800, 116th Cong. § 150110(a)(1)-(2) (2020).  That bill would prohibit the Department from restricting a student's eligibility for HEERF funds for any reason other than "a restriction based solely on the student's enrollment at the [IHE]"—and would, separately, exempt HEERF funds from a separate statutory bar, established in 8 U.S.C. § 1611, which prohibits certain non-qualified aliens from receiving Federal financial aid.  *Id.*

---

[1]  The Act allocates the other ten percent of HEERF funding for specific purposes. Section 18004(a)(2) designates approximately $1 billion for additional awards to IHEs for programs under Titles III and VII of the HEA.  Section 18004(a)(3) designates approximately $355 million for IHEs "that the Secretary determines have the greatest unmet needs related to coronavirus."

The Senate has not yet voted on the measure.  *See* Congress.gov, H.R.6800 - The Heroes Act, https://www.congress.gov/bill/116th-congress/house-bill/6800 (last visited June 2, 2020).

## II.    THE DEPARTMENT'S IMPLEMENTATION OF § 18004 THUS FAR

Almost immediately after the CARES Act was enacted, the Department began its effort to get HEERF funds to IHEs and students as quickly as possible.  In order to keep IHEs and others informed of its progress, the Department designated a page on its Guidance Portal as a centralized repository of information about HEERF funding (HEERF Guidance Page).[2]  As the Department indicated earlier this year, all guidance documents posted on its Guidance Portal, including those posted on the HEERF Guidance page, "lack the force and effect of law, except as authorized by law or as incorporated into a contract."  U.S. Dep't of Education, *Notice of Guidance Portal*, 85 Fed. Reg. 11,056 (Feb. 26, 2020).

Among the information on the HEERF Guidance page is an April 9, 2020 letter, notifying IHEs of the availability of the Student Aid Portion of their allocation and directing IHEs to sign and return a Certificate of Funding and Agreement (Certificate) in order to access the funds.  *See* U.S. Dep't of Education, Letter to Presidents (Apr. 9, 2020) available at https://www2.ed.gov/ about/offices/list/ope/caresactgrantfundingcoverletterfinal.pdf.  The letter indicates that the Department had prioritized the distribution of these funds "in order to get money in the hands of students in need as quickly as possible." *Id.* at 1.  The letter also recognizes that the CARES Act does not specify how the Student Aid Portion should be allocated among "students," and that IHEs therefore could distribute funds "to all students or only to students who demonstrate significant need," but that IHEs were encouraged to consider a maximum amount per student of $6,195, the annual maximum for Federal Pell grant awards.  *Id.*

Through the Certificate, IHEs agree to use the Student Aid Portion of their allocation to provide emergency financial aid to students, "consistent with all applicable laws including non-

---

[2]  *See* U.S. Dep't of Education, Office of Postsecondary Education, CARES Act: Higher Education Emergency Relief Fund, available at https://www2.ed.gov/about/offices/list/ope/ caresact.html (pdf as it existed on June 2, 2020 attached as Exhibit A).  The Court may take judicial notice of such official and undisputed information posted on the Department's website. *See, e.g*., *Ariz. Libertarian Party v. Reagan*, 798 F.3d 723, 727 n.3 (9th Cir. 2015).

discrimination laws."  U.S. Dep't of Education, Office of Postsecondary Education, Recipient's Funding Certification and Agreement, available at https://www2.ed.gov/about/offices/list/ope/heerfstudentscertificationagreement42020.pdf.  The Certificate encourages IHEs to exclude any distributed HEERF funds from students' expected family contributions for purposes of Title IV need calculations and also clarifies that the Department does not consider HEERF funds to constitute Federal financial aid under Title IV.  *Id.*  These amounts thus would not count against students' Title IV aid caps or proprietary institutions' 90/10 funding requirements.  The Certificate requires periodic reports to the Secretary on how IHEs have distributed their HEERF funds.  *Id.* at 2.

Also on April 9, 2020, the Department published information on how it calculated the amounts to be allocated to each eligible IHE pursuant to the formula in § 18004(a)(1).  As explained in its methodology description, the Department necessarily relied on approximations for the factors specified in the statutory formula, using various combinations of past years' FTE enrollment and headcount data for IHEs in its Integrated Postsecondary Education Data System (IPEDS) (excluding IHEs ineligible for or not participating in Title IV) together with Pell Grant Volume data provided by the Federal Student Aid office.  *See* U.S. Dep't of Education, Office of Postsecondary Education, Methodology for Calculating Allocations per Section 18004(a)(1) of the CARES Act, available at https://www2.ed.gov/about/offices/list/ope/heerf90percentformulaallocationexplanation.pdf.

On April 21, 2020, the Department notified IHEs of the availability of and procedures for accessing the Institutional Portion of their § 18004(a)(1) allocation.  The Department also posted to its HEERF Guidance page preliminary guidance on various HEERF-related issues in the form of Frequently Asked Questions (FAQs).  *See* U.S. Dep't of Education, Office of Postsecondary Education, Frequently Asked Questions about the Emergency Financial Aid Grants to Students, available at https://www2.ed.gov/about/offices/list/ope/heerfstudentfaqs.pdf (Student Aid FAQs); U.S. Dep't of Education, Office of Postsecondary Education, Frequently Asked Questions about the Institutional Portion of the Higher Education Emergency Relief Fund,

available at https://www2.ed.gov/about/offices/list/ope/heerfinstitutionalfaqs.pdf (Institutional FAQs). The FAQs covered IHEs' use of the Student Aid Portion of HEERF funds to provide emergency financial aid grants to students (Student Aid FAQs), as well as IHEs' use of the Institutional Portion of their allocated HEERF funds (Institutional FAQs). *See id.* These documents (collectively, the Guidance) are the subject of Washington's lawsuit and its preliminary injunction motion. The Guidance indicates that "[o]nly students who are or could be eligible to participate in programs under Section 484 [(20 U.S.C. § 1091)] in Title IV of the [HEA], as amended . . . , may receive emergency financial aid grants." Student Aid FAQ No. 9; Institutional FAQ No. 5. The Guidance further indicates that the same Title IV eligibility requirements apply to the extent an IHE wishes to use its HEERF allocation to provide "additional emergency financial aid grants" beyond the fifty percent minimum required by § 18004(c). Institutional FAQ No. 5. Nothing in the Guidance, however, suggested that IHEs cannot use their Institutional Portion to provide other assistance, monetary or otherwise, to individuals who are ineligible for emergency financial aid grants, so long as doing so would be consistent with applicable law.

Finally, on May 21, 2020, the Department added further advisory guidance on its HEERF Guidance page that directly addresses some of the issues Washington raises in this action. *See* HEERF Guidance Page, Ex. A. The Department restated that its guidance documents, including the April 21 Guidance, "lack the force and effect of law" and "do not impose any requirements beyond those required under applicable law and regulations." *Id.* The Department further stated that, in light of the non-binding nature of its April 21 Guidance and specifically highlighting the FAQ questions described above, it "will not initiate any enforcement action based solely on these statements." *Id.* The Department contrasted the Guidance with statutory requirements and prohibitions, including the terms of the CARES Act and general eligibility requirements for Federal public benefits, *see* 8 U.S.C. § 1611 (generally excluding non-qualified aliens from eligibility for "any Federal public benefit"). While reiterating that only students eligible for Title IV programs may receive emergency financial aid grants under § 18004(c), the Department

1
2
3

"emphasize[d] that that guidance . . . does not apply to the use of HEERF institutional allocations to cover any costs associated with significant changes to the delivery of instruction due to the coronavirus." *Id.*

4
5
6
7
8
9
10
11
12

In sum, the Department's implementation to date of the HEERF funding directives in the CARES Act has consistently adhered to several principles, albeit not in binding form: (1) HEERF funds do not constitute Title IV Federal financial aid and therefore do not count towards caps or limits on total Title IV aid; (2) emergency financial aid grants may be given only to students who are or could be eligible for Title IV aid; (3) IHEs may provide funds from the Institutional Portion to individuals who do not meet Title IV eligibility to cover costs associated with significant changes to the delivery of instruction; and (4) any use of HEERF funds is subject to otherwise applicable federal law. Although the Department has made this fourth point in non-binding guidance, applicable federal laws themselves are, of course, binding by their own terms.

13

## III. PROCEDURAL HISTORY

14
15
16
17
18

Washington filed their complaint on May 19, 2020, seeking declaratory and injunctive relief in regard to the April 21 Guidance relating to emergency financial aid grants to students. Compl., ECF 1. The Complaint asserts that the Department's issuance of the Guidance violates the APA, *id.* ¶¶ 84–91; that it violates the Constitutional separation of powers, *id.* ¶¶ 92–96; and that it contravenes the Constitution's Spending Clause, *id.* ¶¶ 97–104.

19
20
21
22
23
24
25
26
27

Along with its complaint, Washington filed a motion for preliminary injunction, seeking to enjoin "the implementation or enforcement of the Department's eligibility restriction"—a reference to the April 21 Guidance. Pl. Mot. for Prelim. Inj., ECF 5 at 40 (Pl. Mot.); Pl. Proposed Order, ECF 5-1. Washington sought an expedited hearing schedule on that motion. After we consented to Washington's proposed schedule, on May 28, 2020, Defendants' counsel contacted counsel for Washington, asking whether Washington would be willing to discuss alternatives to briefing the injunction motion in light of the non-binding nature of the challenged Guidance and the Department's clearly stated commitment not to enforce it. Defendants noted that delaying judicial intervention until the Department completed its rulemaking process would

28

DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
Case No. 2:20-cv-00182-TOR

1    conserve the Court's and the parties' resources by avoiding the need for judicial review of a non-

2    binding agency interpretation.  The parties were unable to come to an agreement.

3    A similar challenge to the Department's Guidance is currently pending in the District

4    Court for the Northern District of California.  *See Oakley, et al. v. DeVos, et al.*, No. 20-cv-

5    03215 (N.D. Cal.).  Like Washington, the plaintiffs in that case have moved for a preliminary

6    injunction.  *See* Pl. Mot. for Prelim. Inj., *Oakley, et al. v. DeVos, et al.*, No. 20-cv-03215 (N.D.

7    Cal.), ECF 16.  A hearing on that injunction is currently scheduled for June 9, 2020.  *See* Minute

8    Order, *Oakley, et al. v. DeVos, et al.*, No. 20-cv-03215 (N.D. Cal. May 15, 2020).

9    <u>**ARGUMENT**</u>

10   A preliminary injunction is "an extraordinary and drastic remedy" that should not be

11   granted "unless the movant, by a clear showing, carries the burden of persuasion." *Lopez v.*

12   *Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012). "A plaintiff seeking a preliminary injunction must

13   establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in

14   the absence of preliminary relief, that the balance of equities tips in his favor, and that an

15   injunction is in the public interest." *Karnoski v. Trump*, 926 F.3d 1180, 1198 (9th Cir. 2019)

16   (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)); *see Munaf v. Geren*, 553 U.S.

17   674, 690 (2008) (likelihood of success requires far more than identifying "serious, substantial,

18   difficult, and doubtful" questions).  Here, Washington fails to satisfy any of these factors.

19   **I.    WASHINGTON IS UNLIKELY TO SUCCEED ON THE MERITS BECAUSE**
20   **ITS CHALLENGE IS PREMATURE**

21   Washington's challenge in this case starts with a false premise.  Contrary to what

22   Washington claims, the Guidance put out by the Department of Education is ***not*** "a binding

23   requirement imposed on institutions of higher education."  Pl. Mot. at 15; *id.* at 9.  Rather, as the

24   Department's recent updates make clear, that Guidance reflects the Department's ongoing

25   deliberations, and is merely a waypoint to binding agency action—which has not yet taken

26   place.  Under these circumstances, Washington's challenge is unlikely to succeed because it is

27   unripe.

28   DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
     Case No. 2:20-cv-00182-TOR

A "claim is not ripe for adjudication"—and thus not justiciable—"if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (internal quotes and citations omitted). The doctrine is "designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–08 (2003) (quoting *Abbott Labs v. Gardner*, 387 U.S. 136, 148-49 (1967)); *see also Ass'n of Am. Med. Colls. v. United States*, 217 F.3d 770, 779 (9th Cir. 2000) (*AAMC*). To evaluate ripeness, courts assess "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *AAMC*, 217 F.3d at 779-80.

In the context of challenges to administrative action, the concept of ripeness is "inter-related" with whether there is a "final agency action" within the meaning of § 704 of the APA. *Northcoast Envtl. Ctr. v. Glickman*, 136 F.3d 660, 668 (9th Cir. 1998). To constitute "final agency action" within the meaning of § 704 of the APA, and thus to be reviewable, two conditions must be satisfied: "[f]irst, the action must mark the 'consummation' of the agency's decision–making process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). Notably, the absence of final agency action squarely precludes judicial review under the APA. *See, e.g.*, *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 899 (1990) (APA does not provide a "general judicial review of the [agency's] day-to-day operations"); *Indep. Equip. Dealers Ass'n v. E.P.A.*, 372 F.3d 420, 427–28 (D.C. Cir. 2004) ("when an agency has not yet made any determination or issued any order imposing any obligation [], denying any right [], or fixing any legal relationship, the agency action [is] not reviewable.") (internal quotes and citations omitted).

DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
Case No. 2:20-cv-00182-TOR

1    Here, the Department's Guidance meets *none* of the criteria for final, reviewable agency

2    action.  *First*, as we have noted above, the Guidance is only preliminary.  The Department has

3    explicitly stated that it "*continues to consider* the issue of eligibility for HEERF emergency

4    financial aid grants under the CARES Act and intends to take *further action* shortly."  HEERF

5    Guidance page (emphases added).  It thus cannot be said to have "consummat[ed]," *Bennett*,

6    520 U.S. at 177-78, or "completed" its decisionmaking process, *Franklin v. Massachusetts*, 505

7    U.S. 788, 797 (1992) ("The core question is whether the agency has completed its

8    decisionmaking process, and whether the result of that process is one that will directly affect the

9    parties.").  Rather, the Department issued the Guidance as quickly as practicable to provide

10   IHEs with the Department's initial views on the question of who is eligible to receive

11   emergency financial aid grants, as it continues to develop further agency action on this question.

12   *Second*, and relatedly, the Guidance is not fit for review because it does not have the

13   "status of law" or otherwise demand "immediate compliance with its terms." *AAMC*, 217 F.3d

14   at 780.  And because it lacks such binding legal effect, the Guidance is not cognizable final

15   agency action "by which 'rights or obligations have been determined' or from which 'legal

16   consequences will flow.'" *Bennett*, at 177-78.  To the contrary, the Department made clear, even

17   before the April 21 Guidance was issued, that such "guidance documents lack the force and

18   effect of law, except as authorized by law or as incorporated into a contract."  85 Fed. Reg. at

19   11,056.  It later updated its HEERF Guidance page to reinforce this point with specific

20   reference to all HEERF guidance documents it has made available, including the Guidance at

21   issue here.

22   The Ninth Circuit has held "that even final agency rules may not be fit for review unless

23   the rule has been concretely applied to the plaintiff."  *AAMC*, 217 F.3d at 780.  The court has

24   also held unripe a challenge to an agency interpretation when "no enforcement action against

25   plaintiffs is concrete or imminent or even threatened."  *Stormans, Inc. v. Selecky*, 586 F.3d

26   1109, 1125 (9th Cir. 2009).  And courts addressing agency FAQ responses have recognized that

27   advisory interpretations such as the Guidance, which are "intended 'to give [regulated entities]

28

DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
Case No. 2:20-cv-00182-TOR

further *guidance* on the [relevant federal] laws," which "do not impose new legal requirements," and which "simply . . . *inform[]* [regulated entities] of what the law, previously enacted or adopted, is" do not constitute final agency action. *Golden & Zimmerman, LLC v. Domenech*, 599 F.3d 426, 432-33 (4th Cir. 2010).[3]  So too here.  Far from "submit[ting] the Plaintiff to an entirely new legal regime governing" HEERF funding, *id.*, the Department has explicitly stressed the advisory nature of the Guidance and committed not to enforce it.  Thus, not only has the challenged action, which is *not* a final rule, never been concretely enforced against Washington, but the Department has forsworn any intent to do so, announcing that it "will not initiate any enforcement action based solely on these statements."  HEERF Guidance page.  In other words, the Guidance does not require compliance with its terms, and non-compliance does not create a basis for penalties.  *See, e.g.*, *Abbott Labs*, 387 U.S. at 153 (APA review available "where a regulation requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to non-compliance").

Indeed, the situation here resembles that in *NRDC v. EPA*, 706 F.3d 428, 433 (D.C. Cir. 2013), where the D.C. Circuit rejected, on final agency action grounds, a challenge to an EPA statutory interpretation that "represent[ed] EPA's preliminary views . . . which d[id] not bind the States and public as a matter of law."  Reinforcing the D.C. Circuit's decision was "EPA's expressed intent to issue a final, binding notice-and-comment rule on the issue." *Id.*; *see also DTCC Data Repository (U.S.) LLC v. CFTC*, 25 F. Supp. 3d 9, 15 (D.D.C. 2014) (agency's "subsequent approval" of a final rule "underscores the fact" that its earlier withdrawal of FAQs on the same issue "was not a final agency action").  Given the Department's stated intent

---

[3]  By contrast, when an agency has for years "attempted to enforce" its FAQ response and has relied on it as "the legal basis for the . . . recovery from the Plaintiff of tens of millions of dollars," it has been held to be final agency action. *Children's Hosp. of the King's Daughters, Inc. v. Price*, 258 F. Supp. 3d 672, 684 (E.D. Va. 2017), *aff'd in part, vacated in part*, 896 F.3d 615 (4th Cir. 2018).

DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
Case No. 2:20-cv-00182-TOR

to take further action interpreting § 18004, the non-final nature of the Guidance could not be more clear.[4]

Withholding review at this juncture will not impose any hardship on Washington. The Department has confirmed that IHEs may distribute funds to non-Title IV eligible individuals from their own HEERF Institutional Portions, so long as such funds are to cover "costs associated with significant changes to the delivery of instruction due to the coronavirus," § 18004(c), and the recipient of funds is not independently barred from receiving them. HEERF Guidance page. And again, although the Guidance articulates a preliminary view that § 18004(c) permits emergency financial aid grants only to students eligible for Title IV programs, the Department has stated that it "will not initiate any enforcement action based solely on these statements." HEERF Guidance page. As a result, the only hardship that Washington or its students could experience at this stage arises not from the Guidance but from the *state's* misreading of the Guidance, or its significance. That does not constitute a cognizable hardship. *Nat'l Park Hosp. Ass'n*, 538 U.S. at 811 (rejecting argument "that mere uncertainty as to the validity of a legal rule constitutes a hardship for purposes of the ripeness analysis"). Furthermore, if the Department issues a binding interpretation of § 18004 in the future, Washington can always bring a new challenge—and seek a preliminary injunction then.

By contrast, adjudicating Washington's challenge to the interlocutory guidance could substantially harm the Department by cutting short the Department's deliberations at a time when those deliberations are not only ongoing, but also when the need for them to proceed expeditiously is most acute. *See AAMC*, 217 F.3d at 779 (ripeness requirements intended to "protect the agencies from judicial interference until an administrative decision has been formalized"). Simply put, the Department never intended the Guidance to have the effect of

---

[4] For the same reasons, Washington also lacks Article III standing. Its asserted injuries are not fairly traceable to the non-binding Guidance, but arise solely from their own voluntary decisions. Even if Washington harbors some misplaced concern about future enforcement or has misread the Department's Guidance as somehow binding, such alleged harms are either speculative or self-inflicted and inadequate to support standing. *Cf. Skyline Wesleyan Church v. Cal. Dep't of Managed Health Care*, --- F.3d ---, 2020 WL 2464926, at *8 (9th Cir. 2020).

law—and treating the Guidance as if it did robs the Department of an opportunity to develop and articulate a fulsome interpretation of § 18004's requirements.    Intruding on the administrative process in this way is unnecessary.  Because the challenged Guidance bears none of the hallmarks of reviewable administrative action—under principles of either ripeness (which of course applies to Washington's constitutional claims) or the APA—the Court should decline to review it, and deny Washington's injunction request.

## II. WASHINGTON IS UNLIKELY TO SUCCEED BECAUSE AT LEAST A PORTION OF THE RELIEF IT SEEKS IS BARRED BY OTHER STATUTES

In addition to not being ripe, Washington's claims for relief also suffer from another threshold defect:  they are overbroad.  In particular, Washington asks this Court to determine "that Congress intended to grant institutions of higher education discretion to determine which students will receive CARES Act emergency aid grants, subject *only* to the limitations stated expressly in the CARES Act, section 18004(c)."  Pl. Mot., ECF 5-1, Proposed Order (emphasis added); *see also* Compl. at 40 (Prayer for Relief).  But even apart from Title IV's eligibility criteria, a large number of students who are non-citizens would be ineligible to receive Federal public benefits under an independent statutory bar, 8 U.S.C. § 1611, which has been in effect since 1996. Pub. L. No. 104-193, 110 Stat. 2260.  Washington thus cannot prevail insofar as it seeks relief permitting it to distribute HEERF funds to such individuals.

Section 1611 states that, "[n]otwithstanding any other provision of law," aliens who are not "qualified aliens," as defined in 8 U.S.C. § 1641(b) and (c), are "not eligible for any Federal public benefit." 8 U.S.C. § 1611(a). The HEERF funds at issue in this case, provided by the Department of Education from United States funds appropriated by Congress, are indisputably "Federal public benefits" for purposes of § 1611. *See id.* § 1611(c)(1) (defining "Federal public benefit" to include "any grant . . . provided by an agency of the United States or by appropriated funds of the United States; and . . .  any . . . postsecondary education . . . benefit, or any other similar benefit for which payments or assistance are provided to an individual . . . by an agency

1    of the United States or by appropriated funds of the United States").[5]  Accordingly, non-citizens

2    who are not "qualified aliens" within the meaning of 8 U.S.C. § 1641(b) or (c) are categorically

3    ineligible to receive HEERF funds, whether as emergency financial aid grants or otherwise.

4           Indeed, Congress's statement that the eligibility prohibition of § 1611 was to apply

5    "[n]otwithstanding any other provision of law," 8 U.S.C. § 1611(a), makes clear its intent to

6    subsume any potentially conflicting provision of federal aid.   This is true even for later-enacted

7    provision such as the CARES Act.  *Ill. Nat'l Guard*, 854 F.2d 1403-04; *N.J. Air Nat'l Guard*,

8    677 F.2d at 283 (applying rule of earlier statute when later statute "does not contain any explicit

9    language overriding all statutes with which it may conflict").  Thus, if the question is whether

10   § 1611 overrides a non-qualified alien's claim to HEERF funds, "[a] clearer statement is

11   difficult to imagine." *Ill. Nat'l Guard v. FLRA*, 854 F.2d 1396, 1403 (D.C. Cir. 1988) (quoting

12   *N.J. Air Nat'l Guard v. FLRA*, 677 F.2d 276, 283 (3d Cir. 1982)).  As the Supreme Court has

13   explained, "the use of such a 'notwithstanding' clause clearly signals the drafter's intention that

14   the provisions of the 'notwithstanding' section override conflicting provisions of any other

15   section." *Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 18 (1993).

16          When Congress has chosen to extend a federal benefit to non-qualified aliens it the past,

17   it has done so by amending § 1611 itself. *See* Pub. L. 105–306, § 2, 112 Stat. 2926, 2927

18   (Supplemental Security Income benefits); Pub. L. 105–33, tit. V, § 5561, 111 Stat. 638

19   (Medicare benefits, Railroad Retirement Act benefits). No such amendment has occurred here.

20   And there is no evidence in the text or structure of the education relief provisions of the CARES

21   Act that Congress intended to reverse its longstanding policy and extend the Federal public

22   benefits provided in § 18004(c) to non-qualified aliens.  Given all this, Washington is unlikely

23   to succeed at least insofar as it seeks to distribute HEERF funds to non-qualified aliens, as

24   defined in 8 U.S.C. § 1641.

25          [5]  This is true even though IHEs participate in distributing the funds, and even if the funds
26   are intermixed with funds from other sources. *Pimentel v. Dreyfus*, 670 F.3d 1096, 1099 n.4 (9th
     Cir. 2012) ("[A] federally funded benefit is still considered a 'federal public benefit' even if
27   administered by a state or local agency. . . . [and] even if the state contributes its own funds.");
     *see also* 8 U.S.C. § 1621(c)(3).
28

1
2

### III.    WASHINGTON IS ALSO UNLIKELY TO SUCCEED ON THE MERITS BECAUSE IT MISREADS THE CARES ACT AND RELATED STATUTORY PROVISIONS

3

Even if the Court were to move past the threshold defects of Washington's claims, and

4

proceed to evaluate the Guidance as final agency action—which it should not do—Washington

5

would still fail to establish a likelihood of success on the merits.  Although Washington dresses

6

its challenge in the garb of both APA and Constitutional claims, its arguments boil down to a

7

contention that the language of section 18004(c) of the CARES Act does not admit any room

8

for administrative interpretation—and instead allocates money to "all" students.  *Compare, e.g.*,

9

Pl. Mot. at 15–19 (raising APA claims) *with id.* at 30–34 (Constitutional challenges).  These

10

claims are demonstrably wrong.

11

As confirmed by the House's recent passage of the HEROES Act, the CARES Act does

12

not unambiguously resolve what conditions should govern HEERF money.  It is therefore

13

neither arbitrary under the APA nor constitutionally suspect for the Secretary to seek to explore

14

that question through rulemaking.

15
16

### A.    The CARES Act Delegates Significant Authority to the Secretary, Making Rulemaking Appropriate

17

It is well established that agencies have authority to interpret unclear or ambiguous

18

provisions in the statutes they are charged with administering.  *See generally Chevron, U.S.A.,*

19

*Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843–44 (1984); *Nat'l Cable &*

20

*Telecommunications Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005) ("In *Chevron*,

21

this Court held that ambiguities in statutes within an agency's jurisdiction to administer are

22

delegations of authority to the agency to fill the statutory gap in reasonable fashion.").  Such

23

ambiguity can arise from an unclear term or from the interplay of several different statutory

24

provisions.  *See Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120,

25

132–33 (2000) ("In determining whether Congress has specifically addressed the question at

26

issue, a reviewing court should not confine itself to examining a particular statutory provision in

27

isolation.  The meaning—or ambiguity—of certain words or phrases may only become evident

28

when placed in context."); *see also Brown v. Gardner*, 513 U.S. 115, 118 (1994) ("Ambiguity is a creature not of definitional possibilities but of statutory context").  Where such ambiguity does arise, an agency has the prerogative to resolve the ambiguity in the first instance.  *Brand X*, 545 U.S. at 981 ("[T]he whole point of *Chevron* is to leave the discretion provided by the ambiguities of a statute with the implementing agency.") (internal quotes and citations omitted).

Here, Congress delegated to the Department the responsibility to administer the HEERF program—which the Department is to do not only by calculating and distributing allocations of funds to each IHE, § 18004(b), but also by overseeing the use of those funds by institutions, which are required to "submit [] report[s] to the Secretary, at such time and in such manner as the Secretary may require, that describes the use of [HEERF] funds," § 18004(e).  This administration and oversight role requires the Department to assess whether IHEs' use of HEERF funds appropriately falls within the limits of § 18004(c).  Yet the precise contours of those limits are unclear.

The terms of § 18004(c) provide that IHEs "shall use no less than 50 percent" of their HEERF funds "to provide emergency financial aid grants to students for expenses related to the disruption of campus operations due to coronavirus (including eligible expenses under a student's cost of attendance [. . .]).  CARES Act § 18004(c).  Yet Congress did not clearly define "student" or "financial aid grants."  On their face, these terms appear to reference to Title IV's system of financial aid—but that connection is not explicit.  Elsewhere in § 18004, Congress *did* make an explicit connection to Title IV criteria, stating that the term "cost of attendance" is to be given its "defin[ition] under section 472 of the [HEA]," 20 U.S.C. § 1087*ll*.  CARES Act § 18004(a)(2), (a)(3).  And, of course, in section 18004(b) Congress expressly directed the Department to distribute the aid using the same "systems" it uses for Title IV funding.  The totality of these repeated cross-references demonstrate that Congress structured the provisions of 18004 to work in harmony with Title IV—and raises the possibility that Congress intended the "emergency financial aid grants" referenced in § 18004 to fall within the general financial aid framework that Title IV provides, and to therefore be subject to Title IV's

existing eligibility criteria. It is fair to say, however, that Congress has not "directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842.

Washington protests that there is, in fact, no apparent ambiguity in section 18004 because Congress could have, but did not, indicate that the money should be given to some students and not others—or define the term "student" to have anything other than its ordinary meaning. Pl. Mot. at 23–26. Of course, if Congress *had* explicitly defined "students" or made express reference to Title IV eligibility criteria in section 18004(c) there would be no ambiguity. The ambiguity arises because Congress did not make any such express reference, yet repeatedly borrowed terms from Title IV to explain how HEERF funds may appropriately be used to provide "emergency financial aid grants" to "students." CARES Act § 18004. The totality of these references defeats Washington's attempt to paint Congress's allusion to Title IV as an isolated incident, see Pl. Mot. at 24–25 (incorrectly characterizing § 18004(b) as the "only reference to Title IV"), and raises a question regarding how complete of an integration between section 18004 and Title IV Congress intended to establish. Indeed, it would be strange to conclude that, by expressly incorporating *some* of the definitions of Title IV, Congress *unambiguously* foreclosed the question of whether related components of Title IV are applicable. The better reading is that Congress had left the question open. This reading is supported by the recent passage of the HEROES Act, which seeks to unequivocally divorce Title IV eligibility criteria from HEERF funding—and thereby confirms that the question was not resolved before. *See* H.R. 6800 § 150110(a)(1).

This statutory ambiguity means that, contrary to what Washington claims, Pl. Mot. at 16–18, no express delegation of rulemaking is required within § 18004 for the Department to conduct rulemaking exploring the question. *Brand X*, 545 U.S. at 981 ("In *Chevron*, this Court held that ambiguities in statutes within an agency's jurisdiction to administer are delegations of authority to the agency to fill the statutory gap in reasonable fashion."). Congress would only need to expressly address the Department's rulemaking authority in section 18004 if it sought to alter or change the normal procedures. That, incidentally, is exactly what Congress did in

several provisions of the CARES Act that Washington cites in its brief.  Pl. Mot. at 16–17 (citing CARES Act § 3513(f), where Congress granted the Department the authority to "waive the application" of negotiated rulemaking; section 12003(c), where Congress exempted an agency from the normal notice and comment period; and section 1114, where Congress delegated "emergency rulemaking authority" to the Small Business Administration).

That Congress did not alter the normal rulemaking procedures in the context of § 18004 in no way suggests that the Department's usual rulemaking authority is unavailable; it merely suggests that Congress expected the Department to operate as it normally would under the HEA.  Pursuant to that statute, the Secretary has authority to "make, promulgate, issue, rescind, and amend rules and regulations governing the manner of operation of, and governing the applicable programs administered by, the Department."  20 U.S.C. § 1221e-3; *see id.* § 3474 ("The Secretary is authorized to prescribe such rules and regulations as the Secretary determines necessary or appropriate to administer and manage the functions of the Secretary or the Department.").  That is exactly what the Department has indicated it is in the process of doing.

Washington separately argues that that courts have been "skeptical" of claims of implicit authority, particularly in the context of appropriation statutes.  Pl. Mot. at 17–20.  But, as Washington itself appears to recognize, the cases it cites for that proposition, e.g. *Gonzales v. Oregon*, 546 U.S. 243, 263–64 (2006); *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 478 (1999), do not abrogate *Chevron*.  Rather, both *Gonzales* and *Sutton* rejected the proposition that a limited grant of authority to administer one portion of a statutory scheme vests agencies with the authority to interpret a separate area of the statute.  *Gonzales*, 546 U.S. at 263–64; *Sutton*, 527 U.S. at 478.  That is far removed from the circumstances here, where the HEA unquestionably vests the Department with authority to promulgate rules in connection with the programs it administers—and the terms of the CARES Act, as established by Congress, are ambiguous.

Similarly, none of the cases Washington cites suggest that statutes providing for formula grants, like HEEF, can never contain ambiguous terms that the implementing agency might

1 need to interpret.  *See generally* Pl. Mot. at 18–20; *City of Los Angeles v. Barr,* 41 F.3d 931,

2 941-42 (9th Cir. 2019); *U.S. Dep't of the Navy v. Fed. Labor Relations Auth.*, 665 F.3d 1339,

3 1348 (D.C. Cir. 2012); *Ass'n of Civilian Technicians v. Fed. Labor Relations Auth.*, 370 F.3d

4 1214, 1221 (D.C. Cir. 2004).   To the contrary, *City of Los Angeles v. Barr*, cited by

5 Washington, applied "normal rules of statutory construction" to a formula grant statute.  941

6 F.3d at 941–42.   As discussed above, here those rules of construction indicate that the

7 Department has authority to conduct the very kind of rulemaking Washington wants to cut

8 short.

9         **B.**    **The Department's Preliminary Exercise of its Authority is Neither Arbitrary nor Capricious**

10       The Department has made clear that the Guidance it posted on its website is not intended

11 to have—and does not have—the force or effect of law.  Thus, if the Court chooses not to await a

12 final binding administrative action, Washington's complaint that the Department did not provide

13 a fulsome explanation for its Guidance must be evaluated accordingly.  *See* Pl. Mot. at 27–30.

14 Simply put, Washington cannot cut short the agency's deliberations and then fault the agency for

15 not fully articulating its reasoning.   The Department was not required to provide a detailed

16 explanation of its reasoning in non-binding guidance—and its decision to put out preliminary

17 Guidance to inform IHEs of its thinking should easily survive arbitrary and capricious review.

18 *See McFarland v. Kempthorne*, 545 F.3d 1106, 1113 (9th Cir.2008) (agency decision of "less

19 than ideal clarity" must be upheld if "the agency's path can reasonably be discerned" (citing

20 *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43)).

21       As detailed above, section 18004 relies upon a number of Title IV definitions, standards,

22 and systems—but contains no suggestion that Congress intended to expand the pool of student

23 *recipients* of such grants beyond those eligible under Title IV.   For example, the phrase

24 "emergency financial aid grants" used in § 18004(c) is a clear reference to Title IV's system of

25 financial aid.  Indeed, the same term is used in CARES Act § 3504(a) to describe money that *is*

26 clearly subject to Title IV eligibility criteria—and can thus be presumed to have the same

27 meaning in both places.   The difference between § 3504 and § 18004 is that grants under

28

DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
Case No. 2:20-cv-00182-TOR

§ 3504(a) derive from an IHE's existing Title IV allocation while grants under § 18004(c) derive from HEERF funds.  Yet § 18004(c) contains no suggestion that Congress intended to expand the pool of student *recipients* of such grants beyond those eligible under Title IV.  *Cf. Barr*, 941 F.3d at 941 ("Under the 'normal rule of statutory construction,' we presume that 'identical words used in different parts of the same act are intended to have the same meaning.'" (quoting *Dep't of Revenue v. ACF Indus.*, 510 U.S. 332, 342 (1994)).  Further, Congress clearly referenced Title IV standards in § 18004(c) when it specified that HEERF emergency financial aid grants can be used for "eligible" "cost of attendance" expenses—yet those standards do not legally apply to students ineligible for Title IV programs.  It was therefore entirely reasonable for the Department to suggest that it was contemplating harmonizing section 18004 and Title IV more completely.  Such harmonization would serve the purpose of the CARES Act by making HEERF funds a supplemental source of funding for additional or larger emergency financial aid grants than what IHEs could make under their other Title IV allocations—and accord with other provisions of the CARES Act that grant IHEs greater flexibility to spend their existing Title IV funds.  *See, e.g.*, CARES Act §§ 3504–3510.

Washington faults the Department for allegedly reversing course from its earlier statements in the April 21 Guidance.  Pl. Mot. at 28.  But nothing in the Department's earlier guidance addressed "student" eligibility for emergency financial aid grants under § 18004(c), let alone in a way contrary to the interpretation posted on April 21.  Indeed, it remains the case, as the Department previously stated, that IHEs have significant discretion over how to allocate HEERF funds among students.  There is no set dollar minimum or maximum for emergency financial aid grants provided to eligible students. And although the Guidance provides a preliminary interpretation that students eligible for emergency financial aid grants are those who are generally eligible for financial aid under Title IV, there remains no barrier to IHEs using their Institutional Portion to provide coronavirus-related aid to others, provided such aid is not precluded by other applicable laws.  In addition, the statement in the Certificate that the Secretary "does not consider these individual emergency financial aid grants to constitute

Federal financial aid under Title IV," was simply meant to inform IHEs and eligible students that any emergency financial aid that eligible students receive from HEERF funds will not be counted toward their annual maximums, nor would it affect a proprietary IHE's 90/10 funding obligation. *See* 34 C.F.R. §§ 668.14(b)(16), 668.28. The Certificate statement is no different from what the Department later said in Student Aid FAQ No. 10:  that HEERF funds paid to IHEs "will not be included as revenue for 90/10 purposes."

Washington next asserts that the Department failed to consider relevant factors, such as the needs of ineligible students, the different purposes behind HEERF funding and Title IV financial aid, and the difficulty of assessing students' Title IV eligibility. Pl. Mot. at 26–29.  But again, the April 21 Guidance was a non-binding, preliminary first step, taken in the midst of working out many other issues in the implementation of § 18004 and other CARES Act provisions.  Portions of the CARES Act already provide relief from some Title IV restrictions, such as the requirements for demonstrating that a student is making academic progress, see CARES Act § 3509, thus making more students eligible—and any final determination by the Department on HEERF funds may well provide a mechanism to assist institutions in verifying student eligibility or otherwise addressing student need.  On the other hand, while the Department surely recognizes that individuals who are not eligible for financial aid under Title IV have financial needs, the Department was also entitled to consider the statutory framework and terminology of § 18004(c), which evinces an intent that Federal financial aid should be limited to those meeting the general eligibility requirements set forth in Title IV.  Congress did not provide in § 18004 that everyone enrolled at an IHE should be given emergency relief as a means of providing financial assistance for general living expenses.  Rather, emergency financial aid grants are to support students in their effort to continue their studies while facing "expenses related to the disruption of campus operations due to coronavirus." § 18004(c).  Individuals ineligible for emergency financial aid grants may well be eligible for other assistance under other sections of the CARES Act—awards from the Institutional Portion, for example—unless some

other legal bar applies.  The Guidance is at least reasonable under the circumstances, and is certainly not arbitrary or capricious.

Further, contrary to what Washington claims, while the Department's interpretation of § 18004(c) set forth in the Guidance is logical and consistent with the CARES Act text and structure—and can be upheld on that basis alone—it is also entitled to judicial deference.  When reviewing an informal interpretation that lacks the force and effect of law, a court considers "the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade." *Ctr. for Biological Diversity v. Esper*, --- F.3d ---, 2020 WL 2182175, at *6 n.7 (9th Cir. 2020) (quoting *Skidmore v. Swift*, 323 U.S. 134, 140 (1944)).  In fact, "[a]n agency's interpretation of a statute it administers may be entitled [to] deference even when it appears in a legal brief," *Barnes v. Berryhill*, 895 F.3d 702, 705 n.5 (9th Cir. 2018), and the Ninth Circuit defers to such interpretations when they are "persuasive," *Price v. Stevedoring Servs.*, 697 F.3d 820, 832 & n.8 (9th Cir. 2012) (en banc). *Cf. Kisor v. Wilkie*, 139 S. Ct. 2400, 2417 n.6 (2019) (declining to "foreclose[]" "deference to agency interpretations [of regulations] advanced *for the first time* in legal briefs" (emphasis added)).  So too here.

Although the Department has moved quickly to announce preliminary guidance on HEERF funding, there is no evidence that its consideration of the question has not been thorough.  Its reasoning for limiting eligibility for emergency financial aid grants to Title IV-eligible students is wholly valid and supported by traditional tools of statutory construction. Notwithstanding Washington's contentions, there is also no inconsistency between the Guidance and the Department's earlier statements in the April 9 letter and Certificate, neither of which purported to interpret the phrase "emergency financial aid grants to students."  The Department's interpretation has at least "the power to persuade" and is entitled to deference, particularly since the Department is not seeking to enforce the Guidance against Washington's IHEs or any other entity.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## C.    Washington's Constitutional Claims Are Unlikely To Succeed

As doppelgängers to Washington's APA claims, Washington's constitutional arguments fare no better.  These arguments fail for all the reasons already discussed, and because the cases on which Washington relies bear no relation to the situation here.

Thus, in regard to its separation of powers claim, Washington relies on a case where the plaintiffs challenged an Executive Order that conditioned cities' receipt of *any* federal grant on compliance with a specific law, 8 U.S.C. § 1373, regardless of whether the grant had any connection to implementation of the law.  Pl. Mot. at 30–32; *City & Cty. of S.F. v. Trump*, 897 F.3d 1225, 1232-35 (9th Cir. 2018) (concluding that an Executive Order that directs agencies "to withhold funding that Congress *has not tied to compliance with § 1373*" exceeded the President's authority (emphasis added)).  Here, in contrast, the Department has made no attempt to impose a condition on IHEs that Congress did not; rather, it simply provided an advisory interpretation of a statutory provision it was expressly charged to administer and that indisputably *does* condition the provision of federal funds for specific purposes.  *See* CARES Act § 18004(c) (requiring that HEERF funds be used only in certain ways).

Likewise, Washington misses the mark in claiming that the Guidance imposed by the Department contravenes the Spending Clause's requirements as articulated by the Supreme Court in *Nat'l Fed'n of Indep. Bus. v. Sebelius (NFIB)*, 567 U.S. 519, 575–78 (2012).  First, because the Guidance is non-binding—and the Department has expressly declaimed enforcement actions based solely on that Guidance—the Guidance imposes *no* independent conditions on the receipt of HEERF funds at all, much less ones that are retroactive.  *See* Pl. Mot. at 33–34.  Second, although Washington claims that the Spending Clause prohibits imposition of ambiguous conditions on the receipt of federal moneys, Pl. Mot. at 33, Washington fails to cite any case where an agency's mere interpretation of ambiguous statutory language, in a program established through Congress's exercise of its Spending Power, has been deemed to violate the Spending Clause.  To the contrary, federal agencies commonly provide interpretations of the Spending Clause legislation they are charged with implementing.  Finally, for all the reasons

articulated above, it stretches credulity to believe that the Guidance is *unrelated* to the goals of the CARES Act, as Washington claims, Pl. Mot. at 34, when all the Guidance does is proceed along the path laid out by Congress by clarifying the extent of the connection between section 18004 and Title IV—a connection Congress itself made.

In fact, the Guidance document is not only "reasonably related to the purpose" of the CARES Act, *New York v. United States*, 505 U.S. 144, 172 (1992), but also "share[s] the same goal," *Charles v. Verhagen*, 348 F.3d 601, 609 (7th Cir. 2003)—namely, to defray *eligible* expenses of students in institutions of higher learning during a public health crisis. Washington may have a different conception of what constitutes an eligible expense. But that does not a constitutional violation make.

## IV.  WASHINGTON HAS NOT ESTABLISHED THAT IT IS LIKELY TO SUFFER IRREPARABLE HARM ABSENT AN INJUNCTION

Separate from the merits of its claims, Washington has also failed to carry its burden of demonstrating that it is "likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20; *see also All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (plaintiffs must show irreparable harm is likely, not just possible). To establish a likelihood of irreparable harm, a plaintiff "must do more than merely allege imminent harm sufficient to establish standing; [it] must demonstrate immediate threatened injury." *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1022 (9th Cir. 2016). On top of that, the plaintiff must establish that the threatened harm would *not* occur if an injunction is granted. *See Winter*, 555 U.S. at 20; *Sierra Club v. Trump*, 379 F. Supp. 3d 883, 925-26 (N.D. Cal. 2019) (preliminary injunction warranted only if it "will *prevent* some irreparable injury that is likely to occur before the Court has time to decide the case on the merits") (emphasis added), *appeal filed,* No. 19-16102 (9th Cir. May 29, 2019). Washington fails this test.

First and foremost, Washington cannot be injured in any way by the Guidance because the Department has made clear that the Guidance is not binding and cannot form the basis for any enforcement action. Simply put, nothing currently prevents IHEs from disbursing HEERF

funds without regard to the Guidance—and the injunction Washington seeks would remedy nothing. Any injury Washington claims to be suffering today is the result of its own decisions and interpretations of the Guidance. Those injuries may be redressable by an order against Washington, but not by an order against the Department.

Second, even if Washington had identified some action by the Department which constrained the state's discretion to distribute HEERF money, such injury would hardly be irreparable. So long as Washington ultimately prevails on the merits, it would gain the right to allocate HEERF funds among students according to its interpretation of § 18004(c). To show irreparable injury, Washington thus has to explain how a potential *delay* in distribution of funds is harmful.

The only concrete injury Washington alleges in this regard is the potential dis-enrollment of students—which frustrates the colleges' and universities' mission and leads to a drop in tuition payments. Pl. Mot. at 36–37. Indeed, all of the harms Washington cites ultimately boil down to the proposition that, absent the CARES Act money, a portion of its students will disenroll. *Id.* This proposition, however, is highly speculative. Given the extreme pressure that the coronavirus pandemic has placed on everyone, including students, there is good reason to expect that many students will disenroll regardless of HEERF funding. Washington has not established that a restriction of that funding is the primary reason students are disenrolling—and, by extension, that an injunction permitting a broader distribution of money will reverse that trend. Indeed, it can hardly make that showing given that, even if the Guidance *were* binding, IHEs would still retain significant discretion to award money to needy students out of the Institutional Portion of their HEERF funds.

None of this is to suggest that we are unsympathetic to the difficulties of Washington residents during this pandemic. To the contrary, we are deeply concerned about the health and well-being of Washington residents—as we are about the health and well-being of all Americans. But the source of injury here is not the Department's actions; it is the coronavirus pandemic and its ongoing impacts on multiple facets of everyday life. As a result, Washington

fails to provide a "persuasive counterfactual analysis showing a likelihood that irreparable harm would occur absent an injunction, *but would not occur if an injunction is granted*." *Sierra Club*, 379 F. Supp. 3d at 925-26 (emphasis added). Under these circumstances, a preliminary injunction is unjustified.

## V.   THE REMAINING EQUITABLE FACTORS WEIGH AGAINST PLAINTIFF

Washington must also make a satisfactory showing both that the balance of equities tips in their favor and that the public interest favors an injunction. *All. for the Wild Rockies*, 632 F.3d at 1135. These two factors merge when the federal government is a party. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). Washington fails to support an injunction on either ground. The state asserts generally that it is "in the public interest to ensure that all students who are struggling with the financial fall-out of COVID-19 have access to emergency funding appropriated by Congress." Pl. Mot. at 40. True—but, for all the reasons explained above, the injunction Washington seeks would not serve that interest. Congress has charged the Department with administering and distributing HEERF money. The Department has moved to distribute that money as expeditiously as possible. The public interest now counsels that the Department have an opportunity to finalize its own reasoned interpretation of § 18004(c) before a court reviews, or undercuts, that interpretation.

Moreover, Washington has the ability to allay some of their asserted harms through grants made from non-HEERF sources. Even if the April 21 Guidance were binding, which it is not, it is undisputed that IHEs may use their HEERF Institutional Portion to disburse funds to individuals who are not eligible for Title IV aid, but are not otherwise prohibited from receiving Federal public benefits, in order to cover "costs associated with significant changes to the delivery of instruction due to the coronavirus." § 18004(c). Alternatively, IHEs can use their Institutional Portion to repay other funding sources if the latter are used to make grants to individuals who are not eligible under Title IV (but are eligible to receive Federal public benefits). Such shifting of fungible dollars that are ultimately paid by HEERF funds weighs little, if at all, in the balance of hardships.

An injunction, by contrast, would prematurely and irrevocably foreclose the Department's efforts to administer HEERF funds.  If the Court were to enjoin the Guidance, but then later reverse itself in a final decision on the merits that endorses the Department's interpretation, any HEERF funds distributed to non-eligible recipients would have been distributed contrary to Congressional intent, an outcome that could not be undone.  Regardless of which party's interpretation of § 18004(c) the Court accepts, that outcome would moreover prejudice eligible Title IV students, since an IHE which distributes funds to non-Title IV individuals would necessarily tend to decrease its individual grant amounts.

## **CONCLUSION**

For these reasons, Washington's motion for preliminary injunction should be denied.

DATED:  June 2, 2020                                    Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General
MARCIA BERMAN
Assistant Director, Federal Programs Branch

/s/ Alexander V. Sverdlov
ALEXANDER V. SVERDLOV
  (New York Bar No. 4918793)
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Tel. (202) 305-8550
alexander.v.sverdlov@usdoj.gov

*Attorneys for Defendants*

DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
Case No. 2:20-cv-00182-TOR

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 2nd day of June, 2020, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing.

*/s/ Alexander V. Sverdlov*
ALEXANDER V. SVERDLOV