Matt Adams
NORTHWEST IMMIGRANT
RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
(206) 957-8611

David Hinojosa*
Genevieve Bonadies Torres*
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW
1500 K Street, NW, Suite 900
Washington, DC 20005
 (202) 662-8600
(*pro hac vice applications pending)

Nicholas Espíritu*
Sarah Kim Pak*
Kevin Herrera*
Tanya Broder*
NATIONAL IMMIGRATION LAW
CENTER
3450 Wilshire Boulevard, #108-62
Los Angeles, CA 90010
(213) 639-3900
(*pro hac vice applications pending)

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON
## AT SPOKANE

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>                              Plaintiffs,<br><br>        vs.<br><br>BETSY DeVOS, in her official capacity as Secretary of the United States Department of Education, and the UNITED STATES DEPARTMENT OF EDUCATION, a federal agency,<br><br>                              Defendants. | No. 2:20-cv-00182-TOR<br><br>BRIEF OF AMICI CURIAE BLACK ALLIANCE FOR JUST IMMIGRATION AND OTHER ORGANIZATIONS IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT |

BRIEF OF AMICI CURIAE

# TABLE OF CONTENTS

STATEMENT OF INTEREST OF AMICI CURIAE------------------------------ vi

SUMMARY OF ARGUMENT-------------------------------------------------- 1

ARGUMENT--------------------------------------------------------------- 2

   I.   CONGRESS INTENDED TO EQUIP HIGHER EDUCATION
       INSTITUTIONS WITH DISCRETION AND FLEXIBILITY TO MEET
       THE NEEDS OF THEIR CAMPUS COMMUNITIES -------------------- 2

      A. Plain Text and Legislative Record of the CARES Act Demonstrate
         Congressional Intent to Grant Educational Institutions Broad
         Discretion and Flexibility-------------------------------------------- 3

      B. Congress Intended to Equip Educational Institutions in Assisting
         Their Entire Educational Communities---------------------------------- 6

  II.  DOE'S ATTEMPTS TO IMPOSE PRWORA RESTRICTIONS
       ON HEEREF FUNDING CONTRAVENES CONGRESSIONAL
       INTENT-------------------------------------------------------------- 7

 III.  DOE'S RESTRICTIONS WILL HARM IMMIGRANT STUDENTS
       AND CAMPUSES PROFOUNDLY, CONTRAVENING CONGRESS'
       GOALS UNDER THE CARES ACT -------------------------------- 10

      A. Declarations from Organizations and Students Reflect the
         Devastating Impact of DOE's Eligibility Restrictions on Immigrant
         Students and Their Institutions -------------------------------- 10

      B. Immigrant Students are Integral to Cohesive and Stable Academic
         Communities, but the DOE's Restrictions Will Deprive Universities
         of the Critical Benefits of Their Participation -------------------- 15

      C. Secretary DeVos' Willful Disregard for the Language and Intent of
         HEERF Funding Will Also Compromise Immigrants' Substantial
         Contributions to National and State Economies  ---------------------- 18

  CONCLUSION ------------------------------------------------------------- 20

# TABLE OF AUTHORITIES

**CASES**

*Abramski v. United States*,
    573 U.S. 169 (2014) -------------------------------------------------------- 4

*Fisher v. Univ. of Texas at Austin*,
    136 S. Ct. 2198 (2016) --------------------------------------------------- 16

*Fisher v. Univ. of Texas at Austin*,
    570 U.S. 297 (2013) ------------------------------------------------------ 16

*Grutter v. Bollinger*,
    539 U.S. 306 (2003) ------------------------------------------------------ 16

*Oakley v. Devos*,
    2020 WL 3268661 (N.D. Cal. June 17, 2020) ----------------------------- 8, 9

*Rural Alaska Cmty. Action Program v. Smith*,
    847 F.2d 535 (9th Cir. 1988) -------------------------------------------- 5

**STATUTES**

8 U.S.C. § 1611 --------------------------------------------------- *passim*

Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, 134
    Stat. 281 (2020)------------------------------------------------------- *passim*

Higher Education Emergency Relief Fund,
    134 Stat. § 18004 (2020) ---------------------------------------------- *passim*

**REGULATIONS**

85 Fed. Reg 36494 (Jun. 17, 2020)-------------------------------------------- 3

BRIEF OF AMICI CURIAE

iii

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
(206) 957-8711

OTHER AUTHORITIES

166 Cong. Rec. (Mar. 27, 2020) ------------------------------------------------ *passim*

American Immigration Council, *Immigrants in Washington* (2015)----------------- 20

Peter Barbatis, *Underprepared, Ethnically Diverse Community College Students: Factors Contributing to Persistence*, 33 J. DEV. EDUC. 16 (2010)---------------- 18

Centers for Disease Control and Prevention, *COVID-19 in Racial and Ethnic Minority Groups* (Jun. 25, 2020)-------------------------------------------------- 11

Brief for Amici Curiae Institutions of Higher Education in Support of Respondents, *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 2019 WL 5064961 (U.S. 2019)-------------------------------------------------------- 16, 17

*Frequently Asked Questions about the Emergency Financial Aid Grants to Students under Section 18004 of the Coronavirus Aid, Relief, and Economic Security (CARES) Act*----------------------------------------------------------- 2

Elena Hernandez, *The Washington State Dream Act: An Investment for All Washingtonians*, Washington State Budget & Policy Center (Feb. 2014)--- 17, 18

Dan Kosten, *Immigrants as Economic Contributors: Immigrant Entrepreneurs*, National Immigration Forum (Jul. 11, 2018) ----------------------------------- 19

Dan Kosten, *Immigrants as Economic Contributors: Immigrant Tax Contributions and Spending Power*, National Immigration Forum (Sep. 6, 2018) -------------- 19

Kevin M. Lewis, *Eligibility Requirements for Emergency Financial Aid Grants to Students Under Section 18004 of the CARES Act,* Cong. Research Serv. (May 20, 2020) ------------------------------------------------------------------------- 4

Letter from Secretary of Education, to College and University Presidents (Apr. 9, 2020) ------------------------------------------------------------------------- 4

New American Economy and Presidents' Alliance on Higher Education and Immigration, *Undocumented Students in Higher Education*, Executive Summary (2020) ----------------------------------------------------------------------- 15

Kathleen R. Page, M.D., et al., *Undocumented U.S. Immigrants and Covid-19*, N. Engl. Med. 2020------------------------------------------------------------------------11

Zenen Jaimes Pérez, "Removing Barriers to Higher Education for Undocumented Students," Center for American Progress (December 2014) -----------------------17

Nicole Prchal Svajlenka, *A Demographic Profile of DACA Recipients on the Frontlines of the Coronavirus Response*, Center for American Progress (2020) ------------------------------------------------------------------------------ 19, 20

TheDream.US, *2018-2019 Scholar Survey* (Aug. 2019)------------------------------16

*University Statement on U.S. Supreme Court's DACA Decision*, Gonzaga University (Jun. 18, 2020) ----------------------------------------------------------17

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
(206) 957-8611

**STATEMENT OF INTEREST OF AMICI CURIAE**

The Black Alliance for Just Immigration ("BAJI") was founded in April 2006 in response to the massive outpouring of opposition of immigrants and their supporters to the repressive immigration bills then under consideration by the U.S. Congress. The national debate over immigrant rights is one of the current challenges to racial equity and human rights. BAJI believes that a thriving multiracial democracy requires racial, social and economic justice for all. In its current work, BAJI educates and engages the African American and Black immigrant community to organize and advocate for racial, social and economic justice. BAJI is especially concerned with the impact of COVID-19 on the African American and Black immigrant community and administered a needs assessment survey to its members and networks to gauge the impact. At the local and regional level, BAJI provides training and technical assistance to partner organizations to develop leadership skills, works with faith communities to harness their prophetic voice, and initiates vibrant dialogues with African Americans and Black immigrants to discover more about race, diverse identities, racism, migration, and globalization.

The Lawyers' Committee for Civil Rights Under Law ("Lawyers' Committee") is a nonpartisan, nonprofit organization that was formed in 1963 at the request of President John F. Kennedy to involve the private bar in providing legal

BRIEF OF AMICI CURIAE

vi

services to address racial discrimination. The mission of the Lawyers' Committee is to secure equal justice under law, through the rule of law, targeting in particular the inequities confronting African-Americans and other racial and ethnic minorities. The principal mission of the Educational Opportunities Project at the Lawyers' Committee is to ensure that all students have access to quality educational opportunities and to enforce civil rights protections for all students in K-12 and higher education. In the area of immigration, more recently, Lawyers' Committee's work includes lawsuits challenging the Secretary of Commerce's inclusion of a citizenship question on the 2020 Census in *City of San Jose v. Ross* and President Donald Trump's termination of humanitarian protection and relief for immigrants from Liberia in *African Communities Together v. Trump*, and filing amicus briefs in challenges to the Department of Homeland Security's rescission of the Deferred Action for Childhood Arrivals ("DACA") program (*Regents of the Univ. of California v. Dep't of Homeland Sec.*).

The National Immigration Law Center ("NILC") is the primary national organization in the United States exclusively dedicated to defending and advancing the rights and opportunities of low-income immigrants and their families. Over the past 35 years, NILC has won landmark legal decisions protecting fundamental rights, and has advanced policies that reinforce the nation's values of equality,

BRIEF OF AMICI CURIAE

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
(206) 957-8611

opportunity, and justice. We focus on issues that affect the well-being and economic security of immigrant communities: health care and safety net programs; education and training; workers' rights; and other federal and state policies affecting immigrants. NILC is recognized for its expertise in public benefits laws and policies affecting low-income immigrants, including the implementation of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA). Defendants' misapplication of the laws governing access to services for immigrants will undermine the ability of educational institutions to fulfill their missions during this unprecedented health crisis and will increase the risks to public health and safety.

BRIEF OF AMICI CURIAE

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
(206) 957-8611

# SUMMARY OF ARGUMENT

Through the Coronavirus Aid, Relief, and Economic Security Act (CARES Act), Pub. L. No. 116-136, 134 Stat. 281 (2020), Congress created the Higher Education Emergency Relief Fund (HEERF), so that institutions of higher education (hereinafter "institutions") could "prevent, prepare for, and respond to coronavirus." 134 Stat. § 18004 (a), (c) at 567-68. Authorizing Defendants' restrictions based on its suggestion that the word "students" in the CARES Act is ambiguous would allow federal agencies to repurpose legislation unilaterally and usurp congressional intent, in violation of the Administrative Procedure Act, Spending Clause, and the Separation of Powers doctrine. As detailed below, the legislative history of the CARES Act confirms that Congress intended to grant broad discretion and flexibility to institutions to address disruptions to their campus operations and educational communities due to this pandemic. Congress did not incorporate any limitations on the use of the HEERF funds based on immigration status nor did Congress intend for 8 U.S.C. 1611's limitations to apply. As the appended declarations of students and organizations demonstrate, Defendants' actions undermine the purpose of the HEERF funds, frustrate the educational mission of these institutions, and harm entire academic communities. Supporting all students is necessary to advance the health, safety, and vitality of Washington's campus communities.

BRIEF OF AMICI CURIAE

1

# ARGUMENT

## I.    CONGRESS INTENDED TO EQUIP HIGHER EDUCATION INSTITUTIONS WITH DISCRETION AND FLEXIBILITY TO MEET THE NEEDS OF THEIR CAMPUS COMMUNITIES

On March 27, 2020, Congress enacted the bipartisan CARES Act, and under Section 18004, allocated $12.56 billion to create the HEERF program to help educational institutions "prevent, prepare for, and respond to coronavirus." CARES Act, 134 Stat. §§ 18001(a), (b)(3) at 564; §18004(a)(1) at 567. Despite Congress' intent to provide educational institutions flexibility to meet the needs of their communities during this crisis, on April 21, 2020, Defendants issued guidance restricting eligibility for emergency assistance under HEERF. The guidance declared that these funds would be available to "[o]nly students who are or could be eligible to participate in programs under Section 484 in Title IV of the Higher Education Act." *Frequently Asked Questions about the Emergency Financial Aid Grants to Students under Section 18004 of the Coronavirus Aid, Relief, and Economic Security (CARES) Act*, ECF No. 6-1 at 129, Ex. G. On May 21, 2020, Defendants issued additional guidance limiting eligibility for HEERF emergency assistance further, by imposing the Personal Responsibility and Work Opportunity Reconciliation Act of 1996's (PRWORA's) restrictions on immigrant access to certain "Federal public benefits" under 8 U.S.C. § 1611. On June 17, 2020, after this lawsuit was filed

BRIEF OF AMICI CURIAE

2

challenging the policy, the Department of Education (DOE) published an interim final rule ("IFR") redefining "student" to mean persons "who are or could be eligible" to participate in programs under Title IV. Dep't of Educ., *Eligibility of Students at Institutions of Higher Education for Funds under the Coronavirus Aid, Relief, and Economic Security (CARES) Act*, 85 Fed. Reg. 36494, 36497 (June 17, 2020). Collectively, the DOE's actions to import Title IV and PWRORA eligibility criteria are hereinafter referred to as "restrictions"). The Secretary and DOE's restrictions are arbitrary and capricious and conflict with congressional intent.

### A. Plain Text and Legislative Record of the CARES Act Demonstrate Congressional Intent to Grant Educational Institutions Broad Discretion and Flexibility

Congress' intent to grant broad discretion to educational institutions to address disruptions to their campus operations and their educational communities is evidenced by the plain text of the CARES Act. In Section 18004(c), Congress expressly allows educational institutions to use the HEERF assistance "to cover *any* costs associated with significant changes to the delivery of instruction due to the coronavirus" subject to only two requirements. 134 Stat. at 568 (emphasis added). First, institutions must not use HEERF funds to make "payment to contractors for the provision of pre-enrollment recruitment activities; endowments; or capital outlays associated with facilities related to athletics, sectarian instruction, or

BRIEF OF AMICI CURIAE

3

religious worship." *Id.* Second, institutions must distribute at least half of their HEERF-allocated funds directly to students to help cover expenses related to the disruption of campus operations due to coronavirus. *Id.* Beyond these two requirements, Section 18004 does not place any restrictions on the institutions' use of funds. *See* Letter from Secretary of Education, to College and University Presidents (Apr. 9, 2020), ECF No. 6-1 at 8, Ex. B (presenting the Secretary's once-held view that "[t]he only statutory requirement is that the funds be used to cover expenses related to the disruption of campus operations due to coronavirus"). The requirements in Section 18004(c) govern only *how* HEERF funds may be used, not *which* students an institution may assist. *See* Kevin M. Lewis, *Eligibility Requirements for Emergency Financial Aid Grants to Students Under Section 18004 of the CARES Act,* Cong. Research Serv. 4 (May 20, 2020), https://tinyurl.com/yanw8qp4.

Beyond the unambiguous language of the statute, the legislative record behind the CARES Act confirms Congress' intent to grant broad discretion and flexibility to educational institutions. *See Abramski v. United States*, 573 U.S. 169, 179, (2014) (explaining that when interpreting a statute for which there are conflicting textual interpretations, the court must "interpret the relevant words not in a vacuum, but with reference to the statutory context, 'structure, history, and purpose.'"). On March

22, as Senator Lamar Alexander (R-TN) underscored the critical need for the legislation, he explained that the bill included "money for block grants . . . for higher education . . . which will provide immediate assistance." 166 Cong. Rec. S1895; *see also Rural Alaska Cmty. Action Program v. Smith*, 847 F.2d 535, 536 (9th Cir. 1988) ("the block grant system . . . permits [federal fund grantees] to administer the programs with minimal federal involvement and few federal procedural requirements."). On March 25, Senator Susan Collins (R-ME), emphasized that "direct aid to colleges and universities is needed to help these institutions offset these sudden revenue losses and unexpected costs." 166 Cong. Rec. S2057. On March 27, after describing that schools in her congressional district "need[ed] funding flexibility due to disruption in the academic year from COVID–19," Congresswoman Lauren Underwood (D-IL) remarked that she is "pleased that the CARES Act begins to deliver." *Id.* at H1856.

Congress understood that local institutions, communities, and state and local governments occupy a key role in combatting the pandemic on the front lines, and that they require flexibility to achieve these goals. For example, on March 25, Senator Tom Cotton (R-AR) pointed to the expertise of local authorities with regard to stay-at-home orders and argued that "decisions must be based on local conditions," not "arbitrary" nationally mandated timelines. *Id.* at S2033. During the

House floor debate on March 27, Congressman Anthony Gonzalez (R-OH) voted in support because the CARES Act "provides critical resources for those who need it most: . . . our local leaders who are fighting this virus on the front lines." *Id.* at H1832.

Understanding this, Congress directed the HEERF funds to flow directly to educational institutions, § 18004(a)-(b), 134 Stat. at 567-68, to enable them to fulfill their educational mission, while protecting the health and safety of their student community. In a speech submitted on March 27, Congressman Peter DeFazio (D-OR) explained that emergency relief is provided to educational institutions "to help defray costs, such as lost revenue, to support social distancing and distance education, and to issue emergency grants to impacted students for food, housing, course materials, tech, and healthcare and childcare." 166 Cong. Rec. E345. Congresswoman Pramila Jayapal (D-WA) also clarified that the CARES Act "invests . . . [in] institutions of higher education to help alleviate the challenges educators, students, and families are struggling with." *Id.* at E340.

### B. Congress Intended to Equip Educational Institutions in Assisting Their Entire Educational Communities

Congress created HEERF funding to serve as a community benefit, recognizing that colleges and universities would be best situated to understand and respond to the complex and localized needs of their educational communities. These

BRIEF OF AMICI CURIAE

6

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
(206) 957-8611

needs include providing access and means for students to continue their education and pursue their academic interests. Congressman Thompson (D-CA) explained that the money allocated through the HEERF program would "ensure America's learners are still able to operate remotely and can continue to develop to their full potential." *Id.* at H1860. Similarly, Senator Collins (R-ME) remarked that direct aid to institutions would "make sure that their students could still receive a quality education." *Id.* at S2057.

When setting up the HEERF program, Congress had all students whose education was disrupted by the crisis in mind. *See, e.g., id.* at H1856 (daily ed. Mar. 27, 2020) (statement of Rep. Underwood) (remarking that the grants would "support[] college students whose semesters were disrupted due to COVID-19"); *id.* at H1823 (daily ed. Mar. 27, 2020) (statement of Rep. Scott) (stating that the grants would go to students "displaced" by the COVID-19 crisis). The final language of Section 18004 fulfills Congress' intent by not qualifying or otherwise limiting which students would be eligible. *See* 134 Stat. at 567-68.

## II.  DOE'S ATTEMPTS TO IMPOSE PRWORA RESTRICTIONS ON HEERF FUNDING CONTRAVENES CONGRESSIONAL INTENT

The plain text of the CARES Act does not allow for Defendants' imposition of eligibility restrictions based on immigration status. The legislative record similarly demonstrates that Congress intended to grant educational institutions wide

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
(206) 957-8611

latitude in determining how to utilize these funds. Defendants' efforts to superimpose PRWORA onto HEERF funds ignores not only the text and legislative history of the CARES Act, but also the limited scope of PRWORA's restrictions.

This Court and the Northern District of California agree that the CARES Act is silent regarding any restrictions on students' eligibility for HEERF assistance. *See* Order Grant Mot. Prelim. Inj., ECF No. 31 at 19 ("That Congress . . . failed to include specific language to exclude noncitizens from eligibility for HEERF funds, indicates that the omission was intentional."); *Oakley v. Devos*, No. 20-CV-03215-YGR, 2020 WL 3268661, at *11 (N.D. Cal. June 17, 2020) ("Nothing in Section 18004(c) suggests eligibility requirements . . . apply to the additional, new emergency funds established in the HEERF program."). This silence extends to the application of immigration restrictions of any kind, including by PRWORA's provisions under 8 U.S.C. § 1611(a). In its recent analysis of PRWORA's applicability to HEERF, the Northern District of California was "not persuaded . . . that the Secretary's election to apply 1611(a)'s restrictions to these funds as an eligibility condition would be lawful." *Oakley*, 2020 WL 3268661, at *16.

Longstanding agency interpretation has clarified the types of services that fall within the "Federal public benefit" definition, and those that fall outside of, or are exempt from, its restrictions on immigrant eligibility. *Id*. at *15 (examining federal

BRIEF OF AMICI CURIAE

8

programs exempt from PRWORA and concluding that "1611(a)'s applicability to the HEERF program is far from automatic or 'indisputable'"). HEERF funds are akin to block grants and similar funding streams, which benefit whole communities and institutions. *See id.* at *14 (distinguishing block grants or funding directed at communities from "Federal public benefits"). The timing and scope of the CARES Act is also critical here: HEERF funds are context-specific and responsive to the needs of educational institutions stemming from the sudden COVID-19 crisis. *See* 166 Cong. Rec. H1823 (daily ed. Mar. 27, 2020) (statement of Rep. Bobby Scott) ("[T]he CARES Act is not a stimulus package; it is a disaster relief effort"); *Oakley*, 2020 WL 3268661, at *15 ("[T]he CARES Act and HEERF program were enacted in response to an unprecedented national emergency and public health crisis caused by COVID-19."). Blunt application of PRWORA to a more specific statute passed later in time would undermine the purpose of the CARES Act, demonstrating its poor fit for funds designed to help educational institutions weather a global pandemic. *See id.* at *13 ("[E]ven if HEERF funds were construed to fall within the benefits barred by section 1611(a), Congress' direction that HEERF funds be provided to *all* students supersedes the earlier, more general statute in section 1611, even if it purports to apply 'notwithstanding' other enactments") (emphasis in original).

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
(206) 957-8611

Constraining educational institutions' ability to address these concerns flexibly is incompatible with Congress' understanding that those institutions are best positioned to decide how to help their academic communities survive this pandemic.

## III. DOE'S RESTRICTIONS WILL HARM IMMIGRANT STUDENTS AND CAMPUSES PROFOUNDLY, CONTRAVENING CONGRESS' GOALS UNDER THE CARES ACT

The Department's improper attempts to apply PRWORA to HEERF would have a devastating impact on targeted immigrant students and their campus communities. *See, e.g.*, Ex. 1, Decl. of Gyamfi ¶¶ 9-22.[1] Students excluded from receipt of HEERF funds by DOE's eligibility restrictions are no less integral to the stability and vitality of their educational communities than any other person at those institutions. Declarations by Amicus Black Alliance for Just Immigration (BAJI), immigrant students denied HEERF funds, and related research illustrate the interconnected nature of educational communities and the broader harms that flow from DOE's arbitrary decision to exclude certain students from institutional support.

### A. Declarations from Organizations and Students Reflect the Devastating Impact of DOE's Eligibility Restrictions on Immigrant Students and Their Institutions

---

[1] *See also* Pl. Mot. for Partial Summ. J. (June 29, 2020), ECF No. 37 at 6-8, 13, 17-20 (explaining how these consequences result in violations of the Administrative Procedure Act. 5 U.S.C. §§ 706(2)(A), (C), (D) (2020)).

BRIEF OF AMICI CURIAE

10

Due to "[l]ong-standing system health and social inequities," Black and Latinx populations are at much greater risk of COVID-19 hospitalizations, with rates five times and four times, respectively, greater than non-Hispanic Whites. Centers for Disease Control and Prevention, *COVID-19 in Racial and Ethnic Minority Groups* (Jun. 25, 2020), https://tinyurl.com/ybwns8j7. These dangers are compounded for immigrants of color who often do not have access to health care and other critical supports. Kathleen R. Page, M.D., et al., *Undocumented U.S. Immigrants and Covid-19*, N. Engl. Med. 2020, https://tinyurl.com/yc3kpu6w.

Recognizing the crisis at hand, Amicus BAJI administered a survey in April of 2020 to its members and the communities they serve, to better understand the impact of the COVID-19 pandemic. Ex. 1, Decl. of Gyamfi ¶ 10-12. Over 700 people from across the nation replied, including persons from Washington. *Id.* ¶ 14. An initial review of the results reveals that college students and other respondents experienced significant disruptions to their lives, health, work, housing, safety and education due to the pandemic. This affects not only individuals, but also the broader academic and social communities in which they live. *Id.* ¶ 18.

Respondent students cited lack of funding for basic supports and living expenses, including for food, housing, school, as well as access to technology for

remote learning, health care and child care. *Id.* ¶ 16. Others responded that they were not likely to remain in college because they lacked financial support. *Id.* ¶ 17.

Sworn statements of Washingtonian college students confirm this. A.M., C.M.N. and S.T. are Latinx students who have been granted DACA or have applied for asylum and have graduated from Washington high schools. Ex. 2, Decl. of A.M. ¶¶ 3-4; Ex. 3, Decl. of C.M.N. ¶¶ 3-4; Ex. 4, Decl. of S.T. ¶¶ 3-4. This spring, A.M attended Evergreen State College, C.M.N. attended Western Washington University, and S.T. attended Seattle Pacific University. Ex. 2 ¶ 5; Ex. 3 ¶ 4; Ex. 4 ¶ 5. Each was very involved in school and campus community activities, including participation in diverse campus groups that supported undocumented immigrants. Ex. 2 ¶¶ 3-6; Ex. 3 ¶¶ 5-8; Ex. 4 ¶ 7. For example, before the COVID-19 outbreak forced the closure of Evergreen, A.M. was working closely with members of the Black Student Union to collaborate on a joint conference to respond to violence against a Black woman in the local community and open a dialogue among students of all backgrounds to ensure a safe, welcoming campus that promotes social justice. Ex. 2 ¶ 6. When COVID-19 hit the state and campus community, their collaborative work on campus was disrupted. *Id.* ¶¶ 6, 17; *see also* Ex. 3 ¶ 11-15, 17.

Their education and livelihoods also were undermined. A.M., for example, had to take her classes remotely from home, but her mother provides babysitting

services from the family's home. *Id.* ¶ 10. Because of the noise, she needed to purchase a portable charger to attend her virtual spring classes from the family car. *Id.* Online classes were even more difficult for A.M to manage because her computer was old, slow and needed to be replaced, and she did not have a printer. *Id.* ¶ 11. She also needed better WiFi since she was taking classes from the car. *Id.* Because her family is low-income and her father's work has been inconsistent due to the pandemic, A.M. cannot afford these basic educational necessities. *Id.* ¶ 15.

Despite several setbacks, A.M. continues to serve her community by volunteering at the campus food bank and delivering food to families. *Id.* ¶ 12. She also has been allowed to take food home to help offset costs. *Id.* A.M. has not been able to secure summer employment, which she previously relied upon, in part, to help pay for college. *Id.* ¶¶ 8, 17. Without access to HEERF funds, A.M. may be forced to put her education on hold or to reduce her credit hours. *Id.* ¶¶ 13-17.

C.M.N., who is at "high-risk" for contracting COVID-19 because she has been diagnosed with walking pneumonia, and is without health care, has struggled to pay for rent and food. Ex. 3 ¶¶ 11-13. Her family cannot help because her father lost his job due to COVID-19 and they are struggling to pay their own expenses. *Id.* ¶ 12. C.M.N. has borrowed money from a friend and others in the community. *Id.* It is

particularly disheartening for C.M.N. to know that basic services are being denied to undocumented students inhumanely during a national health crisis. *Id.*

S.T.'s family has very limited finances and she has had to assume financial independence as a freshman in college. Ex. 4 ¶ 9. Her stepfather lost his job due to COVID-19. *Id.* ¶ 13. Her grandparents recently contracted the COVID-19 virus and need funds for their medical expenses. *Id.* She works 30-35 hours per week as an essential frontline worker at a grocery store and has incurred significant expenses in purchasing hygiene products and protective gear for work. *Id.* ¶¶ 8, 11. Her doctor has recommended that she have a procedure for her knees, but she does not have insurance or the funds to cover the medical costs. *Id.* ¶ 12.

Because S.T. shares housing with multiple people, her WiFi is slow, which affects her ability to attend virtual classes and complete her schoolwork. *Id.* ¶ 10. She also had to purchase a new computer. *Id.* If HEERF funds were made available to her, she could use that money to offset the costs of books, purchase higher speed WiFi, secure health care, and reimburse herself for the computer cost. *Id.* ¶ 16. Like A.M., S.T. risks having to put her education on hold or reducing her credit hours.

BAJI's Executive Director Nana Gyamfi's also notes the strong interdependency between undocumented students and their school communities that is at risk. Ex. 1, ¶ 19. The DOE's eligibility restrictions jeopardize not only the

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
(206) 957-8611

education of the excluded individual students but also the vitality, cohesion, and academic rigor of their college communities. *Id.* ¶¶ 20-21.

As stated above (*supra* §§ I-II), HEERF funds were intended to provide emergency funds to universities to sustain students, campus life, and the college community during the crisis. However, by excluding an integral group of highly dedicated and promising immigrant students, the DOE's eligibility restrictions directly interfere with Congress' purpose of providing emergency aid.

### B. Immigrant Students are Integral to Cohesive and Stable Academic Communities, but the DOE's Restrictions Will Deprive Universities of the Critical Benefits of Their Participation.

The DOE's restrictions of HEERF funds not only threaten the well-being of immigrant students, but jeopardize the educational environment across Washington's higher education institutions, harming all students and campus communities. An estimated 454,000 undocumented students attend postsecondary institutions, including 216,000 DACA-eligible students. New American Economy and Presidents' Alliance on Higher Education and Immigration, *Undocumented Students in Higher Education*, Executive Summary (2020) https://tinyurl.com/ycjdrcgt. Washington's institutions enroll the ninth highest number of undocumented students in the nation, roughly 13,000, including about 7,000 who are DACA-eligible. *Id.*

Those students contribute greatly to diverse, thriving campus communities. Diversity across the student body, including racial and ethnic diversity, produces profound benefits for students, institutions of higher education, and the country. *See, e.g., Fisher v. Univ. of Texas at Austin,* 136 S. Ct. 2198, 2210-11 (2016). A diverse student body "promotes cross-racial understanding, helps to break down racial stereotypes, and enables students to better understand persons of different races," *id.* at 2210 (citation omitted), and facilitates "enhanced classroom dialogue and the lessening of racial isolation . . .." *Fisher v. Univ. of Texas at Austin*, 570 U.S. 297, 308 (2013). These benefits serve the goal of "preparing students for work and citizenship" in a diverse society. *Grutter v. Bollinger,* 539 U.S. 306, 331 (2003).

Immigrant students excluded by the DOE's eligibility restrictions are essential members of their campus communities whose contributions enrich Washington's higher education institutions. According to a 2019 survey of over 1,800 undocumented immigrant youth pursuing college, 52 percent of respondents indicated that they had an on- or off- campus leadership role. TheDream.US, *2018-2019 Scholar Survey* (Aug. 2019) (on file with author). Institutions agree. A brief signed by 165 higher education institutions in 32 states—including several Washington-based colleges—attests that DACA students and other immigrant students are "invaluable members of our academic communities." Brief for Amici

BRIEF OF AMICI CURIAE

16

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
(206) 957-8611

Curiae Institutions of Higher Education in Support of Respondents at 13-14, *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 2019 WL 5064961 (U.S. 2019).

University presidents also acknowledge the important role of undocumented students. In his statement hailing the Supreme Court decision in the DACA cases, Gonzaga University President Dr. Thayne M. McCulloh said the ruling "affirms Gonzaga University's longstanding commitment to protect and support our undocumented students and employees. The status of the DACA program . . . is a local and personal matter, affecting students and individuals who are part of our own community." *University Statement on U.S. Supreme Court's DACA Decision*, Gonzaga University (Jun. 18, 2020) https://tinyurl.com/yd786m7y.

The DOE's restrictions on HEERF funds will push immigrant students over the financial brink, forcing their withdrawal from college. Studies of undocumented youth reveal that they face substantial financial strain during college as they generally work part-time jobs to finance their education and support their families. Zenen Jaimes Pérez, "Removing Barriers to Higher Education for Undocumented Students," Center for American Progress 2 (December 2014), https://tinyurl.com/ybqp796c. Washington recognized the financial challenges facing undocumented students, and the benefits of investing in its students, when it approved state grants for undocumented students. Elena Hernandez, *The Washington*

*State Dream Act: An Investment for All Washingtonians*, Washington State Budget & Policy Center (Feb. 2014), https://tinyurl.com/yd7oc2sa.

Attrition of immigrant students causes serious disruptions to the social fabric of an institution and the entire community of learners. Studies demonstrate that feelings of integration in a stable community of learners is one critical aspect of student well-being. *See, e.g.*, Peter Barbatis, *Underprepared, Ethnically Diverse Community College Students: Factors Contributing to Persistence*, 33 J. DEV. EDUC. 16, 24 (2010) (describing challenges by students experiencing changes to social environments). Contrary to Congress' intent to provide funding as a community benefit for students and institutions, the DOE's restrictions on HEERF funds would harm *all students* and campus communities by compromising their institutions' ability to address local concerns in a flexible manner.

### C. Secretary DeVos' Willful Disregard for the Language and Intent of HEERF Funding Will Also Compromise Immigrants' Substantial Contributions to National and State Economies

When the DOE published its IFR, Secretary Devos explained that "U.S. taxpayers have long supported U.S. students pursuing higher education, and this rule simply ensures the continuity of that well-established policy." ECF No. 38-2 (Ex. B). The Secretary's purported rationale, however, is entirely absent from the legislative history and language of the HEERF program. Her logic also ignores the

BRIEF OF AMICI CURIAE

18

economic contributions of immigrant communities, whose access to education and subsequent work is threatened by the DOE's restrictions.

Immigrants—including those affected by DOE's actions—fill critical labor shortages in high and low-skilled jobs, increase tax revenues and consumer spending and boost economic productivity and growth, making lasting contributions to American society. Dan Kosten, *Immigrants as Economic Contributors: Immigrant Tax Contributions and Spending Power*, National Immigration Forum (Sep. 6, 2018) https://tinyurl.com/ycohpups. During the COVID-19 pandemic, about 202,500 DACA recipients have risked their lives on the frontlines as first responders and workers in essential occupations, including health care, education, and the food industry. Nicole Prchal Svajlenka, *A Demographic Profile of DACA Recipients on the Frontlines of the Coronavirus Response*, Center for American Progress (2020), https://tinyurl.com/y7c8ky88/. The resulting tax contributions of immigrants also are significant with immigrants paying about $223.6 billion in federal taxes in 2014. Dan Kosten, *Immigrants as Economic Contributors: Immigrant Entrepreneurs*, National Immigration Forum (Jul. 11, 2018) https://tinyurl.com/y9o6hgrt.

These economic contributions are readily apparent in Washington, including in industries where post-secondary education is a prerequisite to work. Immigrants account for about 1.1 million (15 percent) of Washington's population and 19

percent of the state's workforce. American Immigration Council, *Immigrants in Washington* (2015) 1, 2 https://tinyurl.com/yy8h8qkp. Undocumented individuals contribute significantly to Washington's economic prosperity. Of the state's overall immigrant population, 23 percent are undocumented—accounting for about 3 percent of the state's total population—and about 16,200 are DACA recipients. *Id.* at 2, 4. In 2018, undocumented immigrants in the state paid about $678.7 million in federal taxes and $367.9 million in state and local taxes, including $49.8 million in state and local taxes by DACA recipients that year. *Id.* at 4. During the current COVID-19 pandemic, 6,400 DACA recipients in Washington are working on the frontlines to protect families and communities. *See* Svajlenka, *A Demographic Profile of DACA Recipients on the Frontlines of the Coronavirus Response*, https://tinyurl.com/y7c8ky88/. The DOE's actions will disrupt the education of thousands of students and will compromise their continuing contributions to Washington's economy and its response to a national crisis. These harms provide further evidence that DOE's eligibility restrictions are inconsistent with Congress' intent to stabilize academic communities during the pandemic.

## CONCLUSION

For the reasons stated above, Amici respectfully urge this Court to grant Plaintiff's Motion for Partial Summary Judgment.

BRIEF OF AMICI CURIAE

20

Dated: July 13, 2020                    Respectfully submitted,

NORTHWEST IMMIGRANT
RIGHTS PROJECT

s/Matt Adams
Matt Adams, WSBA #28287
NORTHWEST IMMIGRANT
RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Phone: (206) 957-8611
matt@nwirp.org

To Appear Pro Hac Vice:

Nicholas Espiritu                        David Hinojosa
Sarah Kim Pak                            Genevieve Bonadies Torres
Kevin Herrera                            LAWYERS' COMMITTEE FOR
Tanya Broder                             CIVIL RIGHTS UNDER LAW
NATIONAL IMMIGRATION                     1500 K Street, NW, Suite 900
LAW CENTER                               Washington, DC 20005
3450 Wilshire Boulevard, #108-62         Phone: (202) 662-8600
Los Angeles, CA 90010                    dhinojosa@lawyerscommittee.org
(213) 639-3900                           gbonadies@lawyerscommittee.org
espiritu@nilc.org
kimpak@nilc.org
herrera@nilc.org
broder@nilc.org


Attorneys for Amici Curiae


BRIEF OF AMICI CURIAE                    NORTHWEST IMMIGRANT RIGHTS PROJECT
                        21                      615 Second Avenue, Suite 400
                                                        Seattle, WA 98104
                                                          (206) 957-8611