ETHAN P. DAVIS
Acting Assistant Attorney General
MARCIA BERMAN
Assistant Director, Federal Programs Branch
ALEXANDER V. SVERDLOV
  (New York Bar No. 4918793)
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Tel. (202) 305-8550
alexander.v.sverdlov@usdoj.gov

*Attorneys for Defendants*

**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON
AT SPOKANE**

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>BETSY DEVOS, *et al.,*<br><br>　　　　Defendants. | Case No. 2:20-cv-00182-TOR<br><br>**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................. 2

I.    STATUTORY BACKGROUND ................................................................ 2

    A.    The 1996 Welfare Reform Act ........................................................ 2

    B.    The CARES Act .............................................................................. 3

II.    PROCEDURAL HISTORY ....................................................................... 5

ARGUMENT ..................................................................................................... 6

I.    STANDARD OF REVIEW ....................................................................... 6

II.    HEERF GRANTS FALL WITHIN § 1611's BROAD PROHIBITION ............................ 7

    A.    The Plain Text of § 1611 Makes Clear that HEERF Grants are a Restricted Benefit ........................................................................... 7

    B.    DOJ and HHS Guidance Confirms that HEERF Grants Are an Individual Benefit, Subject to § 1611's Restrictions ............................................................. 11

III.    THE CARES ACT DID NOT ABROGATE § 1611 BY IMPLICATION ..................... 13

CONCLUSION .................................................................................................. 18

# TABLE OF AUTHORITIES

**CASES**

*Af–Cap, Inc. v. Chevron Overseas (Congo) Ltd.*,
  475 F.3d 1080 (9th Cir.2007) .................................................................. 7

*Andrus v. Glover Constr. Co.*,
  446 U.S. 608 (1980) ................................................................................ 9

*Cisneros v. Alpine Ridge Grp.*,
  508 U.S. 10 (1993) ................................................................................. 14

*Connecticut Nat. Bank v. Germain*,
  503 U.S. 249 (1992) ................................................................... 7, 16, 17

*Desert Palace, Inc. v. Costa*,
  539 U.S. 90 (2003) ............................................................................... 6, 7

*Dodd v. United States*,
  545 U.S. 353 (2005) .............................................................................. 16

*Epic Sys. Corp. v. Lewis*,
  138 S. Ct. 1612 (2018) ..................................................................... 13, 16

*Flores v. Sessions*,
  862 F.3d 863 (9th Cir. 2017) ........................................................... 14, 15

*Gonzales v. Oregon*,
  546 U.S. 243 (2006) .............................................................................. 11

*Gross v. FBL Financial Services, Inc.*,
  557 U.S. 167 (2009) ................................................................................ 7

*Hartford Underwriters Ins. Co. v. Union Planters Bank, N. A.*,
  530 U.S. 1 (2000) .................................................................................... 1

*Ill. Nat'l Guard v. FLRA*,
  854 F.2d 1396 (D.C. Cir. 1988) ............................................................ 14

*In re Eastport Assocs.*,
  935 F.2d 1071 (9th Cir. 1991) ................................................................ 9

*La. Pub. Serv. Comm'n v. F.C.C.*,
  476 U.S. 355 (1986) .............................................................................. 11

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Lujan-Armendariz v. I.N.S.*,
  222 F.3d 728 (9th Cir. 2000), *overruled on other grounds by*,
  *Nunez-Reyes v. Holder*, 646 F.3d 684 (9th Cir. 2011) ................................ 13

*Mashiri v. Dep't of Educ.*,
  724 F.3d 1028 (9th Cir. 2013) ................................ 13

*Milner v. Department of Navy*,
  562 U.S. 562 (2011) ................................ 16

*Morton v. Mancari*,
  417 U.S. 535 (1974) ................................ 13, 15, 16

*N.J. Air Nat'l Guard v. FLRA*,
  677 F.2d 276 (3d Cir. 1982) ................................ 14

*N. L. R. B. v. Plasterers' Local Union No. 79, Operative Plasterers' & Cement Masons'*
  *Int'l Ass'n, AFL-CIO*,
  404 U.S. 116 (1971) ................................ 14

*Oakley v. Devos*,
  No. 20-CV-03215-YGR, 2020 WL 3268661 (N.D. Cal. June 17, 2020) ................................ 6, 13

*Oncale v. Sundowner Offshore Servs., Inc.*,
  523 U.S. 75 (1998) ................................ 16

*Perrin v. United States*,
  444 U.S. 37 (1979) ................................ 7

*Pimentel v. Dreyfus*,
  670 F.3d 1096 (9th Cir. 2012) ................................ 8

*Rodriguez v. United States*,
  480 U.S. 522 (1987) ................................ 14

*Sutton v. United Air Lines, Inc.*,
  527 U.S. 471 (1999) ................................ 11

*Transwestern Pipeline Co. v. 17.19 Acres of Prop. Located in Maricopa Cty.*,
  627 F.3d 1268 (9th Cir. 2010) ................................ 7

*TRW Inc. v. Andrews*,
  534 U.S. 19 (2001) ................................ 9

*United States v. Borden Co.*,
  308 U.S. 188 (1939) ................................ 14

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*United States v. Brockamp,*
    519 U.S. 347 (1997)..................................................................................... 9

*United States v. Cabaccang,*
    332 F.3d 622 (9th Cir. 2003) ......................................................................... 6

*United States v. Fausto,*
    484 U.S. 439 (1988)..................................................................................... 13

*United States v. Johnson,*
    529 U.S. 53 (2000)......................................................................................... 9

**STATUTES**

8 U.S.C. § 1611............................................................................................... *passim*

8 U.S.C. §§ 1611-1613 ............................................................................................ 2

8 U.S.C. § 1621(c)(3)............................................................................................... 8

8 U.S.C. § 1641 ..................................................................................... 2, 3, 7, 15

20 U.S.C. §§ 1001 *et seq.*....................................................................................... 3

26 U.S.C. § 7701 ............................................................................................ 14, 15

42 U.S.C. §§ 1396 *et seq.*....................................................................................... 8

Noncitizen Benefit Clarification and Other Technical Amendments Act of 1998,
    Pub. L. No. 105–306, 112 Stat. 2926............................................................ 17

Balanced Budget Act of 1997,
    Pub. L. No. 105–33, 111 Stat. 638................................................................ 17

Coronavirus Aid, Relief, and Economic Security Act (CARES Act),
    Pub. L. No. 116-136, 110 Stat. 281 (2020)............................................. *passim*

Personal Responsibility and Work Opportunity Reconciliation Act,
    Pub.L. No. 104–193, 110 Stat. 2105 (1996) .................................................. 2

**RULES**

Fed. R. Civ. P. 56................................................................................................... 6

DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
Case No. 2:20-cv-00182-TOR

REGULATIONS

*Final Specification of Community Programs Necessary for Protection of Life or Safety Under Welfare Reform Legislation*,
66 Fed. Reg. 3,613 (Dep't of Justice, Jan. 16, 2001)............................................................. 3, 11

*Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA); Interpretation of ''Federal Public Benefit''*,
63 Fed. Reg. 41,658 (HHS, August 4, 1998)................................................................. 3, 11, 12

*Eligibility of Students at Institutions of Higher Education for Funds Under the Coronavirus Aid, Relief, and Economic Security (CARES) Act*,
85 Fed. Reg. 36,494 (Dep't of Education, June 17, 2020) ........................................................ 5

**OTHER AUTHORITIES**

HEROES Act, H.R. 6800, 116th Cong. (2020)
https://www.congress.gov/bill/116th-congress/house-bill/6800........................................... 4, 17

1

## **INTRODUCTION**

2

For nearly a quarter century, 8 U.S.C. § 1611 has broadly prohibited the distribution of

3 "Federal public benefit[s]" to non-qualified aliens. Congress has, over time, amended the

4 statute, exempting narrow categories of health and welfare programs, and adding small groups to

5 the class of "qualified" aliens. The Attorney General, acting on a specific delegation of

6 authority, has clarified that the phrase "Federal public benefit" does not encompass broadly-

7 available, non-*cash* community services. But no amendment has abrogated the core rule, which

8 renders aliens lacking a legal immigration status generally ineligible for "grant[s]" or

9 "benefit[s]" "provided by an agency of the United States or by appropriated funds of the United

10 States," "[n]otwithstanding any other provision of law." 8 U.S.C. § 1611(a), (c)(1)(A)–(B).

11

Congress was well aware of this long-standing prohibition when it passed the

12 Coronavirus Aid, Relief, and Economic Security Act (CARES Act), Pub. L. No. 116-136, 134

13 Stat. 281 (2020). And it provided no special exemption for the newly-created $14.2 billion

14 Higher Education Emergency Relief Fund (HEERF). Because the money students receive from

15 this fund indisputably constitutes a "grant" or "benefit" provided "by appropriated funds of the

16 United States," the provisions of 8 U.S.C. § 1611 limit the class of aliens to whom the money

17 may flow.

18

In challenging this conclusion, plaintiff, the State of Washington (Washington), does not

19 seriously dispute that HEERF grants fall within the literal terms of § 1611. *See* Pl. Mot. Partial

20 SJ Br., ECF 37 (Pl. Br.). Instead, Washington urges the Court to find an implied exemption,

21 arguing that Congress could not have intended the grants to be subject to the long-standing law.

22 But a Court has no authority to disregard the statute's plain language. *See, e.g.*, *Hartford*

23 *Underwriters Ins. Co. v. Union Planters Bank, N. A.*, 530 U.S. 1, 6 (2000) ("[W]hen the statute's

24 language is plain, the sole function of the courts—at least where the disposition required by the

25 text is not absurd—is to enforce it according to its terms." (internal quotes and citation omitted)).

26 And nothing in the CARES Act indicates that Congress intended to alter § 1611's restrictions.

27

28

DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
Case No. 2:20-cv-00182-TOR

Accordingly, the Court should deny Washington's motion for partial summary judgment, and enter judgment on this issue in favor of the United States.

## BACKGROUND

## I.    STATUTORY BACKGROUND

### A.    The 1996 Welfare Reform Act

As part of a set of welfare policy reforms enacted in 1996, Congress passed the Personal Responsibility and Work Opportunity Reconciliation Act (the Welfare Reform Act, or WRA). Pub.L. 104–193, 110 Stat. 2105 (1996).  In that legislation, Congress established a category of "qualified aliens," who could receive public benefits.  *Id.* §§ 1611–13, 1641.  Congress defined "qualified aliens" as legal permanent residents, asylees, refugees, certain parolees, and aliens who fall within other limited categories specified in the statute, stating that those definitions would be understood by reference to the Immigration and Naturalization Act.  *Id.* § 1641(b)-(c). And it enacted a broad prohibition against the payment of benefits to aliens not in those groups. *Id.* § 1611.

The provision establishing that prohibition has three parts.  The first broadly states that: "[n]otwithstanding any other provision of law and except as provided in subsection (b), an alien who is not a qualified alien  . . . is not eligible for any Federal public benefit."  8 U.S.C. § 1611(a).   Subsection 1611(b) then identifies a specific list of programs that constitute "[e]xceptions."  8 U.S.C. § 1611(b).  These include certain very specific payments under the Social Security Act and the Railroad Retirement Act, as well as a more general category of "Federal public benefits" that consists of:  (1) "[m]edical assistance . . . for care and services that are necessary for the treatment of an emergency medical condition"; (2) "short-term, non-cash, in-kind emergency disaster relief"; (3) "[p]ublic health assistance . . . for immunizations"; (4) certain limited "programs, services, or assistance (such as soup kitchens, crisis counseling and intervention, and short-term shelter) specified by the Attorney General"; and (5) a narrow subset of programs administered by the Secretary of Urban Development."  8 U.S.C. § 1611(b).

The last subpart of § 1611 defines "Federal public benefit" to mean:

> (A) any grant, contract, loan, professional license, or commercial license provided by an agency of the United States or by appropriated funds of the United States; and

> (B) any retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit for which payments or assistance are provided to an individual, household, or family eligibility unit by an agency of the United States or by appropriated funds of the United States.

8 U.S.C. § 1611(c). Congress did not further define any of the terms used in this subpart or generally authorize federal agencies to do so. *See generally* 8 U.S.C. § 1641.

However, the Attorney General has issued an order specifying certain exempt programs pursuant to Congress's delegation of authority in 8 U.S.C. § 1611(b)(4). *See Final Specification of Community Programs Necessary for Protection of Life or Safety Under Welfare Reform Legislation*, 66 Fed. Reg. 3,613 (Dep't of Justice, Jan. 16, 2001) (AG Order). And the Department of Health and Human Services (HHS) has promulgated guidance interpreting some of the terms of § 1611 with respect to the programs it administers. *See Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA); Interpretation of "Federal Public Benefit"*, 63 Fed. Reg. 41,658 (HHS, August 4, 1998) (HHS Guidance).

### B.    The CARES Act

On March 27, 2020, Congress passed the CARES Act, providing a package of emergency economic assistance and other support to help people and various institutions cope with the enormous economic and public health crises triggered by the coronavirus pandemic. As part of the CARES Act, Congress designated approximately $14.2 billion for the HEERF, to be allocated by the Secretary to institutions of higher education (IHEs). CARES Act §§ 18001, 18004.

The Act sets forth a formula by which the Department of Education is to allocate ninety percent of the HEERF funding (approximately $12.8 billion) among "institutions of higher

education," within the meaning of Title I of the Higher Education Act, 20 U.S.C. §§ 1001 *et seq.* CARES Act §§ 18004(a), 18007(2).[1]  Under this formula, seventy-five percent of an institution's allocation relies on its share of "full-time equivalent enrollment" of Federal Pell Grant recipients who were not exclusively enrolled in distance education courses prior to the coronavirus emergency, *id.* § 18004(a)(1)(A), while twenty-five percent relies on its "relative share of full-time equivalent enrollment of students who were not Federal Pell Grant recipients" prior to the emergency, *id.* § 18004(a)(1)(B).

An IHE may use its § 18004(a)(1) allocation "to cover any costs associated with significant changes to the delivery of instruction due to the coronavirus."  *Id.* (identifying exceptions not relevant here).  However, the Act requires that no less than fifty percent of HEERF funds received by an IHE under § 18004(a)(1) (the Student Aid Portion) be used "to provide emergency financial aid grants to students for expenses related to the disruption of campus operations due to coronavirus (including eligible expenses under a student's cost of attendance, such as food, housing, course materials, technology, health care, and child care)."  *Id.* § 18004(c).

On May 15, 2020, the House of Representatives passed legislation, referred to as the "HEROES Act," which would prohibit the Department from restricting a student's eligibility for HEERF funds for any reason other than "a restriction based solely on the student's enrollment at the [IHE]"—and would, separately, exempt HEERF funds from the bar established in 8 U.S.C. § 1611.  HEROES Act, H.R. 6800, 116th Cong. § 150110(a)(1)-(2) (2020).  The Senate has not yet voted on the measure.  *See* Congress.gov, H.R.6800 - The Heroes Act, https://www.congress.gov/bill/116th-congress/house-bill/6800 (last visited July 13, 2020).

---

[1]  The Act allocates the other ten percent of HEERF funding for specific purposes. Section 18004(a)(2) designates approximately $1 billion for additional awards to IHEs for certain programs under Titles III, V, and VII of the HEA.  Section 18004(a)(3) designates approximately $355 million for IHEs "that the Secretary determines have the greatest unmet needs related to coronavirus."

DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
Case No. 2:20-cv-00182-TOR

## II.    PROCEDURAL HISTORY

Washington brought this case challenging a series of guidelines that the Department of Education issued regarding the distribution of HEERF money.  *See generally* Compl., ECF 1. Along with its complaint, Washington filed a motion for preliminary injunction, seeking to enjoin "the implementation or enforcement" of those guidelines with respect to Washington IHEs.  Pl. Mot. for Prelim. Inj., ECF 5 at 40; Pl. Proposed Order, ECF 5-1.  The Department opposed the injunction arguing, among other things, that HEERF grants could not be distributed in violation of 8 U.S.C. § 1611.  *See* Defs. Resp. Br., ECF 22 at 15–16.

After the parties completed briefing, the Department finalized an Interim Final Rule (IFR), which codified the Department's preliminary guidelines and imposed binding criteria on HEERF money.  *See Eligibility of Students at Institutions of Higher Education for Funds Under the Coronavirus Aid, Relief, and Economic Security (CARES) Act*, 85 Fed. Reg. 36,494, 36,496 (Dep't of Education, June 17, 2020).  As part of the IFR, the Department noted that, separate from the criteria it was imposing, HEERF grants are subject to the restrictions in 8 U.S.C. § 1611.  *Id.* at 36,496.  As the Department observed:  "[t]o the extent an institution uses HEERF funds, which qualify as 'appropriated funds of the United States,' to provide 'emergency financial aid grants to students,' the grants would qualify as a Federal public benefit under both Section 1611(c)(1)(A) and (B) because they would be "grant[s] . . . by appropriated funds," as well as "postsecondary education" benefits to individuals."  *Id.* at 36,496.

The day after the Department finalized its IFR, but before the IFR was published in the Federal Register, this Court granted Washington's motion for a preliminary injunction with respect to the eligibility criteria imposed by the Department.  PI Order, ECF No. 31.  The Court, however, declined to enjoin enforcement of 8 U.S.C. § 1611, finding that Washington had not established that it was likely to succeed on that part of its claim.  *Id.* at 21.  Two weeks later, Washington filed the instant motion seeking partial summary judgment on the question of whether 8 U.S.C. § 1611 bars distribution of HEERF grants to non-"eligible aliens."  Pl. Br. at 1.

1   In that motion, Washington contends that it wishes to distribute the money to "DREAMers," who

2   would be barred from receiving it if § 1611 applies.[2]  *Id.*

3          A similar challenge is currently pending in the District Court for the Northern District of

4   California.  *See Oakley, et al. v. DeVos, et al.*, No. 20-cv-03215 (N.D. Cal.).  Unlike this Court,

5   the Court in that case granted a preliminary injunction against the enforcement of 8 U.S.C.

6   § 1611 with respect to HEERF money distributed to plaintiffs in that case, reasoning that HEERF

7   money could fall into an exception to the definition of "Federal public benefit" articulated by

8   HHS—or, alternatively, that the CARES Act could be seen as overriding § 1611's provisions.

9   *Oakley v. Devos*, No. 20-CV-03215-YGR, 2020 WL 3268661, at *14–16, 19 (N.D. Cal. June 17,

10  2020).

11                                    **ARGUMENT**

12  **I.     STANDARD OF REVIEW**

13         Although Washington brought this case as a challenge to the Department's guidelines, its

14  current motion does not seek to set aside any particular agency action.  *See generally* Pl. Br. at 1;

15  Pl. Proposed Order, ECF 37-1 at 2.  Rather, that motion merely seeks a declaration that

16  institutions of higher education in Washington may distribute HEERF grants to students without

17  regard to the restrictions in § 1611.[3]  *See id.*  As a result, this motion presents a pure question of

18  law that is subject to de novo consideration.  *See generally* Fed. R. Civ. P. 56; *United States v.*

19  *Cabaccang*, 332 F.3d 622, 624–25 (9th Cir. 2003) ("The construction or interpretation of a

20  statute is a question of law" to be reviewed "de novo").

21  _____

22         [2]  As used by Washington, the term "DREAMer" appears to refer to people benefitting

23  from the immigration program known as Deferred Action for Childhood Arrivals.  Pl. Br. at 1.
    For purposes of this action, such people are indisputably non-qualified aliens within the meaning

24  of 8 U.S.C. § 1611.

25         [3]  Because this requested relief for Washington's partial summary judgment motion is

26  declaratory and general in nature, we do not address whether it can properly apply to private
    institutions in Washington that the state seeks to represent as *parens patriae*.  *See generally*

27  Compl. ¶ 10.  We reserve for later the question of what the appropriate scope of any ultimate
    remedy in this case may be.

28

DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
Case No. 2:20-cv-00182-TOR

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## II.    HEERF GRANTS FALL WITHIN § 1611's BROAD PROHIBITION

Washington urges this Court to declare HEERF grants exempt from the explicit statutory prohibition against the provision of "Federal public benefit[s]" to non-"qualified aliens."  8 U.S.C. § 1611(a).  Pl. Br. at 9–15.  As with any statutory analysis, the "starting point" for analyzing § 1611's applicability "is the statutory text."  *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 98 (2003); *cf. Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253–54 (1992) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there.").  Here, that language is plain, and forecloses carving out unspecified categories of assistance.

### A.    The Plain Text of § 1611 Makes Clear that HEERF Grants are a Restricted Benefit

Section 1611 defines a "Federal public benefit" as *either* (A) "any grant . . . provided by an agency of the United States or by appropriated funds of the United States;" *or* (B) "any . . . postsecondary education . . . benefit, or any other similar benefit for which payments or assistance are provided to an individual . . . by an agency of the United States or by appropriated funds of the United States."  8 U.S.C. § 1611(c).  Because Congress did not further define the terms "grant" or "postsecondary education . . . benefit," see generally 8 U.S.C. § 1641, those terms must be given their ordinary and most natural meanings.  *See Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 175 (2009) ("Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose" (internal quotation marks omitted)); *Transwestern Pipeline Co., LLC v. 17.19 Acres of Prop. Located in Maricopa Cty.*, 627 F.3d 1268, 1270 (9th Cir. 2010) ("[U]nless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning" which may be determined by "consult[ing] dictionary definitions" (citing *Perrin v. United States*, 444 U.S. 37, 42 (1979) and *Af–Cap, Inc. v. Chevron Overseas (Congo) Ltd.*, 475 F.3d 1080, 1088 (9th Cir.2007) (internal quotes omitted)).

1    Under any ordinary usage, HEERF money, which the Department distributes from a

2    specific fund created by Congress—and which is to be used to "provide emergency financial aid

3    *grants* to students" CARES Act § 18004(c) (emphasis added)—fall within the meaning of

4    "grant" as used in § 1611(c)(1)(A).    *See, e.g.*, *Grant*, Cambridge Dictionary,

5    https://dictionary.cambridge.org/us/dictionary/english/grant (last visited July 14, 2020)

6    (defining grant as "an amount of money given especially by the government to a person or

7    organization for a special purpose:  a student/research grant; a local authority/government

8    grant"); *Grant*, Merriam-Webster, https://www.merriam-webster.com/dictionary/grant (last

9    visited July 14, 2020) ("[A] gift (as of land or money) for a particular purpose.").    Indeed,

10    Congress repeatedly used the term "grant" to refer to HEERF money, and there is no indication

11    Congress intended the term to have other meaning than it has in § 1611.  *See generally* CARES

12    Act § 18004.  Similarly, because Congress directed that HEERF money be granted to individual

13    higher education "students for expenses related to the disruption of campus operations due to

14    coronavirus," id., the money *also* constitutes a "postsecondary education" benefit "provided to

15    an individual . . . by appropriated funds of the United States," within the meaning of

16    § 1611(c)(1)(B).

17    The fact that HEERF money passes through a school on its way to a student does not

18    alter this analysis.  *See, e.g.*, *Pimentel v. Dreyfus*, 670 F.3d 1096, 1099 n.4 (9th Cir. 2012) ("[A]

19    federally funded benefit is still considered a 'federal public benefit' even if administered by a

20    state or local agency. . . . [and] even if the state contributes its own funds."); *see also* 8 U.S.C.

21    § 1621(c)(3).  Elsewhere in § 1611 Congress explicitly attached the label of "Federal public

22    benefit" to a variety of services provided through third parties.  *See* 8 U.S.C. § 1611(b)(1).

23    These include (1) emergency "[m]edical assistance under title XIX of the Social Security Act,"

24    42 U.S.C. § 1396 et. seq., which provides grants to states for medical programs, as well as (2)

25    programs specified by the Attorney General which, among other things, "deliver in-kind

26    services at the community level, including through *public or private* nonprofit agencies."  8

27    U.S.C. § 1611(b) (emphasis added).  In specifically identifying such programs as a type of

28

"Federal public benefit," Congress made clear that the reach of the term is expansive, and covers most benefit programs involving federal dollars, regardless of whether an intermediary is involved.

Washington contends that none of this is dispositive because § 1611 still allows a variety of benefits to reach non-qualified aliens. Pl. Br. at 9. But the exceptions Congress specified only confirm that HEERF grants fall within the broad category of "Federal public benefit[s]" subject to § 1611(a)'s bar. To wit: Congress crafted only three, exceedingly narrow, carve-outs from the definition of "Federal public benefit" in § 1611(c), none of which involves payment of benefits to a large class, and none of which is even remotely similar to the present circumstances. *See* 8 U.S.C. § 1611(c)(2) (providing that the definition shall not apply to "any contract, professional license, or commercial license for a nonimmigrant whose visa for entry is related to such employment," to circumstances involving payments under "reciprocal treaty agreements," or "to the issuance of a professional license to . . . a foreign national not physically present in the United States"). And when Congress chose to remove a broader benefit program from § 1611(a)'s prohibitions, it purposefully did not exclude that program from the definition of "Federal public benefit," but rather identified the program as an enumerated "[e]xception[]" to the general rule. 8 U.S.C. § 1611(b) (exempting programs providing certain non-monetary services noted above, as well as a narrow category of grandfathered payments and payments to aliens "lawfully present" in the United States under the Social Security Act and the Railroad Retirement Act).

There would, of course, be no reason for Congress to specifically identify such "[e]xceptions" *unless* programs providing money or other benefits from federal funds *were* a restricted form of "Federal public benefit" by default. *See generally In re Eastport Assocs.*, 935 F.2d 1071, 1080 (9th Cir. 1991) ("Generally, statutes should be construed to give their terms meaning and effect, avoiding [i]nterpretive constructions which render some words surplusage." (internal quotes and citation omitted)). And the very act of identifying specific "[e]xceptions" confirms that Congress did not intend the list to contain more. *See TRW Inc. v. Andrews*, 534

U.S. 19, 28 (2001) ("Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent." (quoting *Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616–617 (1980)); *see also United States v. Brockamp*, 519 U.S. 347, 352 (1997) ("explicit listing of exceptions" to running of limitations period considered indicative of Congress' intent to preclude "courts [from] read[ing] other unmentioned, open-ended, 'equitable' exceptions into the statute"); *see generally United States v. Johnson*, 529 U.S. 53, 58 (2000) ("When Congress provides exceptions in a statute, it does not follow that courts have authority to create others.")

Washington thus gets things exactly backwards. By setting out a general rule followed by certain narrow exceptions, § 1611(a) creates a clear presumption that benefits like HEERF grants shall *not* be available to non-"qualified aliens." Such a presumption cannot be overcome by analogy. Rather, the presumption can only be overcome if the benefit at issue meets one of the literal "[e]xceptions" that Congress specified in § 1611(b).

In its brief, Washington fails to identify any of the particularly enumerated exceptions in § 1611(b) the HEERF grants allegedly satisfy. *See generally* Pl. Br. at 9–15. That is not surprising. None of the programs Congress specifically exempted in § 1611 are facially related to postsecondary education, or even administered by the Department. *See generally* 8 U.S.C. § 1611(b). And those that involve direct payment of money are almost exclusively limited to aliens "lawfully present in the United States." *Id.* 1611(b)(2)–(5) (identifying certain payments under the Social Security Act and the Railroad Retirement Act). If the plain terms of the statute mean anything, they mean that HEERF grants cannot be shoehorned into such unrelated exceptions. The inescapable conclusion must be that HEERF grants are restricted "Federal public benefits," and may not flow to non-"qualified aliens" under the plain terms of 8 U.S.C. § 1611(a).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

   **B.    DOJ and HHS Guidance Confirms that HEERF Grants Are Individual Benefits, Subject to § 1611's Restrictions**

   Rather than contend with the statutory text, Washington looks for a foothold in administrative guidance promulgated by the Attorney General and HHS, contending that this guidance creates exceptions to § 1611's requirements that are broad enough to accommodate HEERF money.  Pl. Br. at 10–13.  But this argument is likewise unsustainable.

   In § 1611, Congress specifically delegated the Attorney General authority to specify certain "Federal benefit programs" that would be exempt from § 1611(a)'s general prohibitions.  8 U.S.C. § 1611(b)(1)(D).  This delegation is narrow, and empowers the Attorney General, in consultation with other agencies, to specify "[p]rograms, services, or assistance (such as soup kitchens, crisis counseling and intervention, and short-term shelter) . . . which (i) deliver *in-kind* services at the community level, including through public or private nonprofit agencies; (ii) do not condition the provision of assistance, the amount of assistance provided, or the cost of assistance provided on the individual recipient's income or resources; and (iii) are necessary for the protection of life or safety."  *Id.* (emphasis added).  The Attorney General issued an order specifying as exempt the statutorily-suggested crisis centers, soup kitchens, short-term shelter, and other "programs, services, or assistance necessary for the protection of life or safety."  Attorney General Order No. 2353-2001, 66 Fed Reg. 3,613-02 (Jan. 16, 2001).  But, echoing the authorizing statute's language, the Attorney General noted that the programs she exempted are those that provide "*in-kind (non-cash)*" benefits.   *Id.* at 3,616 (emphasis added).   These limitations exclude HEERF grants which are *cash awards*, and which provide assistance to help students continue their studies despite the disruption of campus operations, rather than to protect "safety" or "life."  *Id.*

   Meanwhile, HHS's guidance is wholly irrelevant because nothing in § 1611 grants HHS broad authority to interpret the section's terms for other federal agencies or for programs that Congress did not entrust to HHS.  *See, e.g.*, *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 478 (1999) (rejecting the claim that agency had authority to define "disability" under the Americans

with Disabilities Act when Congress did not provide such authority in the subpart of the statute setting out the definition); *see also Gonzales v. Oregon*, 546 U.S. 243, 259 (2006), 546 U.S. at 263-64 (holding that the Attorney General lacked authority to interpret the meaning of the law, even when granted authority to ensure compliance with that law); *La. Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 374 (1986) (an agency "literally has no power to act . . . unless and until Congress confers power upon it").  HHS's guidance merely clarifies how *HHS* interprets the term "Federal public benefit" with respect to HHS programs, and that clarification is inapplicable to HEERF grants.  *See* HHS Guidance, 63 Fed. Reg. 41,659.

Further, even if HHS's definitions were somehow applicable here, they still would not help Washington.  HHS provided that definition A of "Federal public benefit"—which covers "grants," 8 U.S.C. § 1611(c)(1)(A)—"generally include[s] agreements or arrangements between Federally funded programs and individuals, such as research grants, student loans, or patent licenses," and "*refers to financial awards to individuals* . . . not . . . so-called 'block grants' which are provided to states or localities." *Id*. (emphasis added).  Separately, HHS stated that definition B, which identifies "postsecondary education" benefits, 8 U.S.C. § 1611(c)(1)(B), pertains to benefits where an "individual, household, or family must, as a condition of receipt, meet specified criteria (e.g., a specified income level or residency)," and "do[es] not include benefits that are generally targeted to communities or specified sectors of the population," such as women or children.  *Id.*

Washington seeks to capitalize on these limitations by characterizing HEERF money as "block grants" that serve a school community, Pl. Br. at 13–14, but this characterization is unavailing.  HEERF grants constitute "financial awards to individuals" for purposes of definition A because, notwithstanding the fact that the money goes through schools, Congress mandated that *no less* than fifty percent of the money go directly to students.  *See* CARES Act § 18004(c).  That schools may have some discretion in how to allocate this money does not make the money any less of a "financial award[]" those students receive.  Meanwhile, to receive the money, students *do* have to satisfy specified criteria:  they have to be enrolled in school, and

"have expenses related to the disruption of campus operations due to coronavirus." *Id.*  In this way, eligibility for HEERF grants *does* depend on "variations in individual characteristics," akin to "income level" or "specified age," which HHS recognized makes assistance a "Federal public benefit" under definition B.  63 Fed. Reg. 41,659–60.  And because the "preponderance" of the benefits go to individuals, id., the grants cannot be considered an exempt "[m]ixed-benefit program," as Washington suggests, Pl. Br. at 15.  *See* 63 Fed. Reg. at 41,600 (explaining that mixed-benefit programs can be exempt if they are "primarily designed to . . . provide services to communities").

Indeed, as a category of financial assistance designed to further students' education, HEERF grants are directly analogous to "research grants, [and] student loans" that HHS specifically identified as falling within the definition of "Federal public benefit."  63 Fed. Reg. 41,659.  The Ninth Circuit has previously recognized that such loans are a "Federal public benefit" within the meaning of § 1611, *Mashiri v. Dep't of Educ.*, 724 F.3d 1028, 1032 (9th Cir. 2013), and there is no textual basis to find the similar assistance here to be otherwise.

For all these reasons, the Court in *Oakley* was incorrect to conclude that HEERF grants could constitute community benefits that fall within one of the exceptions to "Federal public benefits" identified by HHS.  *Oakley*, 2020 WL 3268661, at *16.  That result is, respectfully, inconsistent with the nature of the grants and a misapplication of HHS's guidance.  The plain language of § 1611 countermands such a result, and this Court should decline to adopt it.  HEERF grants fall within the literal terms of § 1611, and must be subject to the section's restrictions.

## III.    THE CARES ACT DID NOT ABROGATE § 1611 BY IMPLICATION

Because HEERF grants fall within the plain language of § 1611's prohibition, Washington is left to contend that Congress overrode that provision when it authorized such grants under § 18004 of the CARES Act.  Pl. Br. at 15–20.  But the CARES Act contains no explicit provision lifting, or even mentioning, the requirements of 8 U.S.C. § 1611—either in § 18004 nor anywhere else.  *See generally* CARES Act § 18004.  As a result, Washington must

1   show that the repeal or abridgment it claims happened by implication.  *See Lujan-Armendariz v.*

2   *I.N.S.*, 222 F.3d 728, 743 (9th Cir. 2000) (where the "the new [] law does not on its face repeal"

3   or "mention" the old one, any "repeal, partial or whole, [] must be by implication"), *overruled*

4   *on other grounds by Nunez-Reyes v. Holder*, 646 F.3d 684 (9th Cir. 2011).  Such repeals are not

5   to be found lightly.

6          There is a "'stron[g] presum[ption]' that repeals by implication are 'disfavored' and that

7   'Congress will specifically address' preexisting law when it wishes to suspend its normal

8   operations in a later statute."  *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1624 (2018) (quoting

9   *United States v. Fausto*, 484 U.S. 439, 452–53 (1988)).  A plaintiff wishing to show otherwise

10  "faces a stout uphill climb."  *Id.*  Court are generally not at "liberty to pick and choose among

11  congressional enactments" and must instead endeavor "to give effect to both."  *Morton v.*

12  *Mancari*, 417 U.S. 535, 551 (1974) (internal quotes omitted).  A repeal by implication "will not

13  be found unless an intent to repeal is 'clear and manifest.'"  *Rodriguez v. United States*, 480

14  U.S. 522, 524 (1987) (quoting *United States v. Borden Co.*, 308 U.S. 188, 198 (1939)).  Mere

15  silence is insufficient.  *Flores v. Sessions*, 862 F.3d 863, 875 (9th Cir. 2017) ("[A] basic canon

16  of statutory construction requires that we presume Congress does not silently abrogate existing

17  law."); *see also N. L. R. B. v. Plasterers' Local Union No. 79, Operative Plasterers' & Cement*

18  *Masons' Int'l Ass'n, AFL-CIO*, 404 U.S. 116, 129–30 (1971) ("The Court has frequently

19  cautioned that it is at best treacherous to find in Congressional silence alone the adoption of a

20  controlling rule of law." (internal quotes and alteration omitted)).

21         Washington's burden is especially high because § 1611 *already* addresses what to do in

22  the case of a potential conflict.  The text of § 1611(a) expressly states that, subject to the

23  specifically enumerated exceptions, the prohibition against providing "Federal public benefits"

24  to non-qualified aliens shall apply "*[n]otwithstanding* any other provision of law."  8 U.S.C.

25  § 1611(a) (emphasis added).  As the Supreme Court has explained, "the use of such a

26  'notwithstanding' clause clearly signals the drafter's intention that the provisions of the

27  'notwithstanding' section override conflicting provisions of any other section."  *Cisneros v.*

28

1  *Alpine Ridge Grp.*, 508 U.S. 10, 18 (1993).  This is true even for later-enacted provisions such

2  as the CARES Act.  *See Ill. Nat'l Guard v. FLRA*, 854 F.2d 1396, 1403 (D.C. Cir. 1988); *N.J.*

3  *Air Nat'l Guard v. FLRA*, 677 F.2d 276, 283 (3d Cir. 1982)) (applying rule of earlier statute

4  when later statute "does not contain any explicit language overriding all statutes with which it

5  may conflict").  Indeed, Washington cites no case where a later statute overrode an earlier one

6  with a non-obstante clause.  *See* Pl. Br. at 19–20.

7      Here, all the statutory indicators Washington identifies fall far short of establishing a

8  "clear and manifest" intent to override § 1611's provisions.  *First*, Washington references the

9  portion of the CARES Act dealing with refundable tax credits.  Pl. Br. at 18.  By its terms, that

10 provision excludes "nonresident alien individual[s]" from eligibility for such credits.  CARES

11 Act § 2201.  But the Internal Revenue Code carries its own residency definitions, which are

12 distinct from the usages employed in section 1611 or in immigration law.  *Compare* 26 U.S.C.

13 § 7701(b) (defining "resident alien" and "nonresident alien" for purposes of taxation) *with* 8

14 U.S.C. § 1641 (defining "qualified alien" in reference to the Immigration and Nationality Act).

15 For example, the Internal Revenue Code considers a person to be a "[r]esident alien" if, among

16 other things, that person meets a "substantial presence" test, which is *not* tied to immigration

17 status but to physical presence in the United States.  26 U.S.C. § 7701 (b)(1)(A)(ii).  Certain

18 people, such as DREAMers, may thus be considered "resident aliens" for purposes of the

19 Internal Revenue Code—even though they are, unquestionably, *not* "qualified aliens" within the

20 meaning of section 1611.  *See* 8 U.S.C. § 1641.  Congress addressing the background rules of

21 alien eligibility in the context of the Internal Revenue Code therefore says nothing about its

22 intent with respect to immigration-based restrictions generally, nor manifests an intent to repeal

23 § 1611(a).

24     The same is true for the other CARES Act provisions that Washington cites as

25 containing eligibility criteria.  Pl. Br. at 18 (citing CARES Act §§ 1102(a)(2)(36)(A) (defining

26 "eligible recipients" for paycheck protection program); 2107(b)(1) (describing unemployment

27 compensation as being available "for each eligible individual"); 18003(d)(8) (can use funds "to

28

provide meals to eligible students")).  Simply put, none of those eligibility criteria speak to immigration status, and thus cannot be seen as a "clear and manifest" intent to abrogate a restriction like § 1611.  *See id.*; *see generally Morton*, 417 U.S. at 551.  And any suggestion, Pl. Br. 17, that Congress would need to affirmatively reference § 1611 to indicate its vitality is a non-starter.  Congress need not affirmatively restate longstanding laws to affirm their applicability—especially when, like § 1611, those laws contain a clear *non obstante* clause.  *See Flores*, 862 F.3d at 875 n.13 (rejecting argument that "to preserve existing laws or agreements, [Congress] must make an explicit statement to that effect," and noting that "Congress need not repeat every provision of a statute or agreement that it is not repealing or terminating").

*Second,* Washington's invocation of the HEERF allocation formula similarly misses the mark, because that formula does not speak to which *students* may receive money.  *See* Pl. Br. at 16–17 (citing CARES Act § 18004(a)).  Instead, the formula speaks to the allocation of HEERF money *among* schools.  CARES Act § 18004(a).  In that context, Congress's direction that the Department take account of the "full time equivalent students . . . not exclusively enrolled in distance education" merely uses the "full time equivalent" measure as a proxy for overall school size—and thus for the costs that a school might incur in changing how it delivers instruction. *Id.* § 18004(a)(1).  Indeed, the qualification Congress used in the formula—referring to "full time *equivalent* students," rather than merely "students"—suggests that Congress was thinking in terms of broader statistics, rather than about individual eligibility.  *Id.* (emphasis added).  To say that the invocation of "full time equivalent students" in an allocation formula clearly means that *all* students *must* receive money notwithstanding any other provision of law is an unjustified leap of logic, and would rewrite the plain text of the statute.  Such a logical leap is not even close to the "clear and manifest" intention required to override a pre-existing law. *Morton*, 417 U.S. at 551.

*Third,* and finally, the Supreme Court has repeatedly admonished that an appeal to a statute's general purpose cannot substitute for the statute's plain language.  *See Dodd v. United*

1    *States*, 545 U.S. 353, 359 (2005) ("Although we recognize the potential for harsh results in

2    some cases, we are not free to rewrite the statute that Congress has enacted."); *Oncale v.*

3    *Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998) ("[I]t is ultimately the provisions of

4    our laws rather than the principal concerns of our legislators by which we are governed."); *see*

5    *also Milner v. Department of Navy*, 562 U.S. 562, 574 (2011) ("Legislative history, for those

6    who take it into account, is meant to clear up ambiguity, not create it.").  Nor is a Court free to

7    override one statute based on another's general goals.  *See, e.g.*, *Epic*, 138 S. Ct. at 1624–25

8    (declining to find a conflict between the Federal Arbitration Act and the National Labor

9    Relations Act).  "[S]o long as there is no positive repugnancy between two laws . . . a court

10    must give effect to both."  *Connecticut Nat. Bank*, 503 U.S. at 253 (internal quotes and citations

11    omitted).  Washington's observation, Pl. Br. at 19, that the CARES Act is designed to distribute

12    emergency coronavirus aid is therefore immaterial.  Because giving effect to both § 18004 and

13    § 1611 "would not render one or the other wholly superfluous," the former cannot supersede the

14    latter's specific restrictions on aid to non-qualified aliens "by negative implication."

15    *Connecticut Nat. Bank*, 503 U.S. at 253.[4]

16         When Congress wanted to extend a federal benefit to non-qualified aliens it the past, it

17    did so by amending § 1611 itself.  *See, e.g.*, Pub. L. 105–306, § 2, 112 Stat. 2926, 2927

18    (Supplemental Security Income benefits); Pub. L. 105–33, tit. V, § 5561, 111 Stat. 638

19    (Medicare benefits, Railroad Retirement Act benefits).  No such amendment occurred as part of

20    the CARES Act—a fact highlighted by the subsequent introduction of the HEROES Act, which

21    contains an explicit provision lifting § 1611's requirements for HEERF money.  *See* H.R. 6800,

22

23         [4]  The same principle renders irrelevant the legislative history that amici propound in
      their proposed brief.  *See* Mot. Leave to File Br., ECF No. 41 at 4; Proposed Br. of Amici Curiae,
24    ECF No. 41-1 at 5–7 (Amici Br.).  "When presented, on the one hand, with clear statutory
      language and, on the other, with dueling committee reports, [the Court] must choose the
25    language."  *Milner*, 562 U.S. at 574.  Moreover, all of the statements amici cite address the
      general ways in which HEERF money will help IHEs and students.  Amici Br. at 5–7.  Not one
26    evinces a desire to override existing statutory requirements and provide money to non-qualified
      aliens.  *See id*.  An implied repeal cannot be presumed from such silence.
27

28

1   116th Cong. § 150110(a)(1)-(2).  The introduction of that legislation in the House confirms that

2   Congress knows how to override the restrictions of § 1611 when it wishes to do so.  There is, by

3   contrast, nothing in the text or structure of the CARES Act that reverses Congress's

4   longstanding policy and extends the Federal public benefits provided in § 18004(c) to non-

5   qualified aliens.

6       In short, because HEERF grants are "Federal public benefits," they are subject to

7   § 1611's bar.

8                                    **CONCLUSION**

9       For these reasons, Washington's motion for partial summary judgment should be denied.

10

11

12  DATED:  July 14, 2020              Respectfully submitted,

13                                     ETHAN P. DAVIS
                                       Acting Assistant Attorney General
14                                     MARCIA BERMAN
                                       Assistant Director, Federal Programs Branch
15

16                                     /s/ Alexander V. Sverdlov
                                       ALEXANDER V. SVERDLOV
17                                       (New York Bar No. 4918793)
                                       Trial Attorney
18                                     U.S. Department of Justice
19                                     Civil Division, Federal Programs Branch
                                       1100 L Street, NW
20                                     Tel. (202) 305-8550
21                                     alexander.v.sverdlov@usdoj.gov

22                                     *Attorneys for Defendants*

23

24

25

26

27

28

DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
Case No. 2:20-cv-00182-TOR

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of July, 2020, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing.

*/s/ Alexander V. Sverdlov*

ALEXANDER V. SVERDLOV

DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
Case No. 2:20-cv-00182-TOR