JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
MARCIA BERMAN
Assistant Director, Federal Programs Branch
ALEXANDER V. SVERDLOV
　(New York Bar No. 4918793)
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Tel. (202) 305-8550
alexander.v.sverdlov@usdoj.gov

*Attorneys for Defendants*

# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON
### AT SPOKANE

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>BETSY DEVOS, et al.,<br><br>　　　　Defendants. | Case No. 2:20-cv-00182-TOR<br><br>**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION**<br><br>NOTED FOR: March 17, 2021<br>Without Oral Argument |

# **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................1

BACKGROUND ....................................................................................................3

   I.   THE CARES ACT ........................................................................................2

   II.   THE DEPARTMENT'S PRELIMINARY GUIDANCE AND RULEMAKING..................4

   III.   PROCEDURAL HISTORY............................................................................6

STANDARD OF REVIEW ......................................................................................7

ARGUMENT ..........................................................................................................7

   I.   THE IFR PROPERLY IDENTIFIES AND INTERPRETS AMBIGUITY IN § 18004 OF THE CARES ACT ........................................................................................7

      A.  The IFR Identifies Ambiguities in the Text of § 18004 that Make Rulemaking Appropriate ........................................................................................7

      B.  The Interpretation the Department Articulated in the IFR is Reasonable ..........................11

   IV.   WASHINGTON'S CONSTITUTIONAL CLAIMS LACK MERIT..................13

CONCLUSION.....................................................................................................14

# TABLE OF AUTHORITIES

**Cases**

*Ass'n of Civilian Technicians v. Fed. Labor Relations Auth.*,
  370 F.3d 1214 (D.C. Cir. 2004) .................................................................. 10

*Brown v. Gardner*,
  513 U.S. 115 (1994) ...................................................................................... 8

*Charles v. Verhagen*,
  348 F.3d 601 (7th Cir. 2003) ...................................................................... 14

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
  467 U.S. 837 (1984) ........................................................................... 8, 10, 11

*City & Cty. of S.F. v. Trump*,
  897 F.3d 1225 (9th Cir. 2018) .................................................................... 14

*City of Los Angeles v. Barr*,
  941 F.3d 931 (9th Cir. 2019) ...................................................................... 10

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000) ...................................................................................... 8

*Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs.*,
  545 U.S. 967 (2005) ........................................................................... 8, 10, 11

*Nat'l Fed'n of Indep. Bus. v. Sebelius (NFIB)*,
  567 U.S. 519 (2012) .................................................................................... 14

*Skidmore v. Swift*,
  323 U.S. 134 (1944) .................................................................................... 11

**Statutes**

8 U.S.C. § 1373 ................................................................................................ 14

8 U.S.C. § 1611 ........................................................................................... *passim*

20 U.S.C. § 1070(a) .......................................................................................... 2

20 U.S.C. § 1070a .............................................................................................. 2

20 U.S.C. § 1087 ................................................................................................ 2

20 U.S.C. § 1091 ................................................................................................ 2

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION
Case No. 2:20-cv-00182-TOR

20 U.S.C. § 1091(a) ................................................................................................. 3

20 U.S.C. § 1001 ..................................................................................................... 2

Pub. L. No. 89-329, 79 Stat. 1219 (1965) ............................................................... 2

Pub. L. No. 116-136, 134 Stat. 281 (2020) ..................................................... *passim*

**Regulations**

85 Fed. Reg. 36,494 (June 17, 2020) ............................................................. *passim*

**Legislative Materials**

H.R. 6800, 116 Cong. § 150110(a)(1)-(2) (2020) ............................................ 3, 11

**INTRODUCTION**

Last March, as the unprecedented coronavirus pandemic was just beginning, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (CARES Act), Pub. L. No. 116-136, 134 Stat. 281 (2020), to address the mounting public health and economic crises. Among its many provisions, the CARES Act created a $14.2 billion appropriation of emergency funding, called the Higher Education Emergency Relief Fund (HEERF), and enlisted the U.S. Department of Education and Secretary of Education Betsy DeVos to distribute money from the fund to institutions of higher education (IHE) across the country. Within weeks, the Department calculated the amount of HEERF funds to be allocated to each institution and issued preliminary guidance in which the Department expressed its view that emergency financial aid grants contemplated by of the CARES Act should be governed by the general criteria established in Title IV of the Higher Education Act of 1965 (HEA). The Department separately commenced a formal rulemaking process, which ultimately codified the Department's interpretation as an Interim Final Rule (IFR). Before the Department could complete that rulemaking process, however, plaintiff, the State of Washington (Washington), moved to preliminarily enjoin the Department's guidance. This Court granted that injunction the day after the Department announced that it had completed its rulemaking process, but before the IFR took effect.

The preliminary injunction has remained in effect since it was issued. Now that Washington has moved to convert the preliminary injunction into a final judgment, however, Defendants renew their prior arguments in opposition. For the reasons previously presented, and now fulsomely elaborated in the IFR, the relevant provision of the CARES Act, § 18004(c), is ambiguous. Further, there are clear indicia in the text of § 18004(c), and elsewhere in the CARES Act, that Congress had the Title IV framework in mind when creating the HEERF program, and good policy reasons to incorporate Title IV criteria into the HEERF scheme. Though Washington attempts to paint this interpretation as improper overreach, the IFR evinces a reasonable analysis and balancing of competing factors. It should therefore be sustained, and Washington's motion for summary judgment denied.

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION
Case No. 2:20-cv-00182-TOR

1

# BACKGROUND

## I. THE CARES ACT

On March 27, 2020, Congress passed the CARES Act to provide an unprecedented package of emergency economic assistance and other support to help people and various institutions cope with the enormous economic and public health crises triggered by the coronavirus pandemic. The President signed the CARES Act into law the same day. As part of the CARES Act, Congress appropriated $30.75 billion, to remain available through September 30, 2021, for the Department to allocate among governors, elementary and secondary schools, and IHEs and their students. Of that amount, the Act designates approximately $14.2 billion for the HEERF, to be allocated by the Secretary to higher education. CARES Act §§ 18001-18004.

Crucially, the HEERF provisions of the CARES Act references provisions in Title IV of the HEA. The HEA, as amended, Pub. L. No. 89-329, 79 Stat. 1219 (1965), is a comprehensive statutory scheme under which the federal government supports eligible institutions of higher education and their students. Title IV of the HEA, devoted to student assistance, is intended "to assist in making available the benefits of postsecondary education to eligible students . . . in institutions of higher education," including by providing for payments to States and assistance to IHEs themselves. 20 U.S.C. § 1070(a). Title IV thus includes the major federal student financial aid programs such as Pell Grants, 20 U.S.C. § 1070a; federal work-study programs, *id.* §§ 1087-51 to -58; and a system of federal loans to students and parents, *id.* §§ 1087a-1087ii.

Against the backdrop of the HEA, the CARES Act sets forth a formula by which the Department is to allocate ninety percent of the HEERF funding (approximately $12.8 billion) among "institutions of higher education," within the meaning of Title I of the HEA, 20 U.S.C. §§ 1001 *et seq.* CARES Act §§ 18004(a), 18007(2).[1] Under this formula, seventy-five percent of

---

[1] The Act allocates the other ten percent of HEERF funding for specific purposes. Section 18004(a)(2) designates approximately $1 billion for additional awards to IHEs for programs under Titles III, V and VII of the HEA. Section 18004(a)(3) designates approximately $355 million for IHEs "that the Secretary determines have the greatest unmet needs related to coronavirus."

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION
Case No. 2:20-cv-00182-TOR

2

an institution's allocation relies on its share of "full-time equivalent enrollment" ("FTE") of Federal Pell Grant recipients who were not exclusively enrolled in distance education courses prior to the coronavirus emergency, *id.* § 18004(a)(1)(A), while twenty-five percent relies on its share of FTE of non-Pell Grant recipients who were not exclusively enrolled in distance education courses prior to the coronavirus emergency, *id.* § 18004(a)(1)(B). The Act specifies that the funds made available to each institution "shall be distributed by the Secretary using the same systems as the Secretary otherwise distributes funding to each institution under [HEA's] title IV." *Id.* § 18004(b).

Of particular relevance in this case, the Act requires that no less than fifty percent of HEERF funds received by an IHE under § 18004(a)(1) (the Student Aid Portion) be used "to provide emergency financial aid grants to students for expenses related to the disruption of campus operations due to coronavirus (including eligible expenses under a student's cost of attendance, such as food, housing, course materials, technology, health care, and child care)." *Id.* § 18004(c). The Act leaves the terms "emergency financial aid grants" and "student" undefined. An IHE may use the remaining amount of its § 18004(a)(1) allocation (the Institutional Portion) "to cover any costs associated with significant changes to the delivery of instruction due to the coronavirus." *Id.* (identifying exceptions not relevant here).

On May 15, 2020, the House of Representatives passed legislation, referred to as the "HEROES Act." *See* HEROES Act, H.R. 6800, 116th Cong. § 150110(a)(1)-(2) (2020). That bill would prohibit the Department from restricting a student's eligibility for HEERF funds for any reason other than "a restriction based solely on the student's enrollment at the [IHE]"—and would, separately, exempt HEERF funds from a separate statutory bar, established in 8 U.S.C. § 1611, which prohibits certain non-qualified aliens from receiving Federal financial aid. *Id.* The Senate did not vote on the measure before the end of the 116th Congress. *See* Congress.gov, H.R.6800 - The Heroes Act, https://www.congress.gov/bill/116th-congress/house-bill/6800 (last visited June 2, 2020).

## II. THE DEPARTMENT'S PRELIMINARY GUIDANCE AND RULEMAKING

Almost immediately after the CARES Act was enacted, the Department began its effort to get HEERF funds to IHEs and students as quickly as possible. In order to keep IHEs and others informed of its progress, the Department designated a page on its Guidance Portal as a centralized repository of information about HEERF funding, and published information regarding the distribution of funds. Of particular relevance here, the Department published a letter dated April 9, 2020, notifying IHEs of the availability of the Student Aid Portion of their allocation and directing IHEs to sign and return a Certificate of Funding and Agreement (Certificate) in order to access the funds. *See* U.S. Dep't of Education, Letter to Presidents (Apr. 9, 2020) available at https://www2.ed.gov/about/offices/list/ope/caresactgrantfundingcoverletter final.pdf. The letter indicates that the Department had prioritized the distribution of these funds "in order to get money in the hands of students in need as quickly as possible." *Id.* at 1. The letter also recognizes that the CARES Act does not specify how the Student Aid Portion should be allocated among "students," and that IHEs therefore could distribute funds "to all students or only to students who demonstrate significant need," but that IHEs were encouraged to consider a maximum amount per student of $6,195, the annual maximum for Federal Pell grant awards. *Id.*

Also on April 9, 2020, the Department published information on how it calculated the amounts to be allocated to each eligible IHE pursuant to the formula in § 18004(a)(1). As explained in its methodology description, the Department necessarily relied on approximations for the factors specified in the statutory formula, using various combinations of past years' FTE enrollment and headcount data for IHEs in its Integrated Postsecondary Education Data System (IPEDS) (excluding IHEs ineligible for or not participating in Title IV) together with Pell Grant Volume data provided by the Federal Student Aid office. *See* U.S. Dep't of Education, Office of Postsecondary Education, Methodology for Calculating Allocations per Section 18004(a)(1) of the CARES Act, available at https://www2.ed.gov/about/offices/list/ope/ heerf90percentformula allocationexplanation.pdf.

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION
Case No. 2:20-cv-00182-TOR

4

On April 21, 2020, the Department notified IHEs of the availability of and procedures for accessing the Institutional Portion of their § 18004(a)(1) allocation. The Department also posted to its HEERF Guidance page preliminary guidance on various HEERF-related issues in the form of Frequently Asked Questions (FAQs). *See* U.S. Dep't of Education, Office of Postsecondary Education, Frequently Asked Questions about the Emergency Financial Aid Grants to Students, available at https://www2.ed.gov/about/offices/list/ope/heerfstudentfaqs.pdf (Student Aid FAQs); U.S. Dep't of Education, Office of Postsecondary Education, Frequently Asked Questions about the Institutional Portion of the Higher Education Emergency Relief Fund, available at https://www2.ed.gov/about/offices/list/ope/heerfinstitutionalfaqs.pdf (Institutional FAQs). The FAQs covered IHEs' use of the Student Aid Portion of HEERF funds to provide emergency financial aid grants to students (Student Aid FAQs), as well as IHEs' use of the Institutional Portion of their allocated HEERF funds (Institutional FAQs). *See id*. These documents (collectively, the Guidance) are the subject of Washington's lawsuit and its preliminary injunction motion. The Guidance indicates that "[o]nly students who are or could be eligible to participate in programs under Section 484 [(20 U.S.C. § 1091)] in Title IV of the [HEA], as amended . . . , may receive emergency financial aid grants." Student Aid FAQ No. 9; Institutional FAQ No. 5. The Guidance further indicates that the same Title IV eligibility requirements apply to the extent an IHE wishes to use its HEERF allocation to provide "additional emergency financial aid grants" beyond the fifty percent minimum required by § 18004(c). Institutional FAQ No. 5. Nothing in the Guidance, however, suggested that IHEs cannot use their Institutional Portion to provide other assistance, monetary or otherwise, to individuals who are ineligible for emergency financial aid grants, so long as doing so would be consistent with applicable law.

The Department's guidance reflected preliminary views regarding the proper interpretation of § 18004. To give those views legal effect, the Department engaged in a formal rulemaking process. After the commencement of this case, the Department finalized its IFR, which codified the Department's preliminary guidelines and imposed binding criteria on HEERF

money. *See Eligibility of Students at Institutions of Higher Education for Funds Under the Coronavirus Aid, Relief, and Economic Security (CARES) Act*, 85 Fed. Reg. 36,494, 36,496 (Dep't of Education, June 17, 2020). The IFR stated that it would take effect the day it was published in the Federal Register. *Id.* at 36,494.

### III.   PROCEDURAL HISTORY

Washington filed their complaint on May 19, 2020, seeking declaratory and injunctive relief in regard to the April 21 Guidance relating to emergency financial aid grants to students. Compl., ECF 1. The Complaint asserted that the Department's issuance of the Guidance violates the APA, *id.* ¶¶ 84–91; that it violates the Constitutional separation of powers, *id.* ¶¶ 92–96; and that it contravenes the Constitution's Spending Clause, *id.* ¶¶ 97–104. Along with its complaint, Washington filed a motion for preliminary injunction, seeking to enjoin "the implementation or enforcement of the Department's eligibility restriction"—a reference to the April 21 Guidance. Pl. Mot. for Prelim. Inj., ECF 5 at 40.

The parties completed briefing on Washington's motion for a preliminary injunction before the Department had finalized its IFR. The Court held a hearing on the motion on June 11, 2020—the same day the IFR was finalized. The next day, June 12, 2020, the Court issued a preliminary injunction, explaining that Washington was likely to succeed on its arguments that the CARES Act did not delegate rulemaking authority to the Department and that the Department's interpretation of § 18004 was unpersuasive. PI Order, ECF No. 31 at 23-25, 30. The Court did not reach Washington's alternative arguments that the Department's interpretation was arbitrary and capricious, nor did it reach Washington's constitutional challenges. *Id.* Notably, however, the Court declined to enjoin the application of a separate statutory provision, 8 U.S.C. § 1611, which prohibits the provision of public benefits to certain non-qualified aliens. *Id.* at 21. The IFR was published in the Federal Register five days later. 85 Fed. Reg. at 36,494.

Washington subsequently moved for partial summary judgment on the separate legal question of whether 8 U.S.C. § 1611 applies to HEERF money. *See* ECF No. 37. After briefing,

this Court denied that motion, concluding that the CARES Act did not override the long-standing bar that § 1611 creates. ECF No. 63 at 17-18.

The parties now cross-move for summary judgment on Washington's other claims.

## STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Where claims call for judicial review under the Administrative Procedure Act ("APA"), "summary judgment is an appropriate mechanism for deciding the legal question" presented. *Ctr. for Envtl. Health v. McCarthy*, 192 F. Supp. 3d 1036, 1040 (N.D. Cal. 2016) (citation omitted). In general, the Court must uphold an agency decision unless the decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2).

## ARGUMENT

**I.    THE IFR PROPERLY IDENTIFIES AND INTERPRETS AMBIGUITY IN § 18004 OF THE CARES ACT**

Although this Court previously concluded that § 18004(c) of the CARES Act contains no delegation of rulemaking authority to the Department, it did so in the context of deciding a preliminary injunction, and without the parties addressing the fulsome interpretation that the Department articulated in the IFR. The current procedural posture offers an opportunity to revisit the IFR and consider anew the ambiguities it identifies in the language of § 18004(c). Those ambiguities—and the Department's fulsome explanation for its interpretation of those ambiguities—render the IFR an appropriate exercise of the Department's authority.

**A.    The IFR Identifies Ambiguities in the Text of § 18004 that Make Rulemaking Appropriate**

It is well established that agencies have authority to promulgate regulations interpreting unclear or ambiguous provisions in the statutes they are charged with administering. *See*

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION
Case No. 2:20-cv-00182-TOR

7

*generally Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843–44 (1984); *Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005) ("In *Chevron*, this Court held that ambiguities in statutes within an agency's jurisdiction to administer are delegations of authority to the agency to fill the statutory gap in reasonable fashion."). Such ambiguity can arise from an unclear term or from the interplay of several different statutory provisions. *See Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132–33 (2000) ("In determining whether Congress has specifically addressed the question at issue, a reviewing court should not confine itself to examining a particular statutory provision in isolation. The meaning—or ambiguity—of certain words or phrases may only become evident when placed in context."); *see also Brown v. Gardner*, 513 U.S. 115, 118 (1994) ("Ambiguity is a creature not of definitional possibilities but of statutory context"). Where such ambiguity does arise, an agency has the prerogative to resolve the ambiguity in the first instance. *Brand X*, 545 U.S. at 981 ("[T]he whole point of *Chevron* is to leave the discretion provided by the ambiguities of a statute with the implementing agency.") (internal quotes and citations omitted).

Here, it is undisputed that Congress charged the Department with the responsibility to administer the HEERF grants under § 18004. Yet the provision contains terms whose parameters are unclear. As the Department explained in the IFR, "[a]lthough the second sentence of section 18004(c) states that the emergency financial aid grants are to be given to students, the CARES Act does not define the term 'student' or the phrases 'grants to students' or 'emergency financial aid grants to students.'" 85 Fed. Reg. 36,495. Within the context of § 18004, the phrases "grants to students" or "financial aid" could be read on their face, without reference to any other statutory or regulatory provision. *See id.* (noting "the term 'student'" can be understood "to cover anyone engaged in learning, or anyone enrolled in any way at an institution"). But Congress's decision to entrust the distribution of such grants and financial aid to the Department—which has extensive experience overseeing and administering various other grants and financial aid to students under the elaborate framework of Title IV of the HEA—

could also suggest that Congress wished the Department to bring its expertise to bear on the issue, and treat § 18004 distributions harmoniously with the Title IV programs.  Notably, as the IFR observed, Congress "included an implicit reference to title IV terms" in § 18004(c) when it referenced "eligible expenses" "immediately after the phrase 'emergency financial aid grants to students,'" and made  "explicit references to that same title IV standard following the phrase 'grants to students' in two of the preceding subsections, 18004(a)(2) and (a)(3) ('the student's cost of attendance (as defined under section 472 of the Higher Education Act')."  85 Fed. Reg. at 36,495.  Indeed, the Department identified no less than five references to Title IV in the text of § 18004.  *Id.* 36,496-97.

In its preliminary injunction Order, this Court concluded that these and other selective references to Title IV did not create ambiguity, but rather reflected Congress's "intentional" decision *not* to subject § 18004(c) distributions to Title IV eligibility criteria.  PI Order at 24.  In a different portion of its opinion, the Court suggested that this lack of ambiguity foreclosed finding multiple meanings for the terms "student" and "emergency financial aid grants," as used in § 18004.  *Id.* at 29-30.  Respectfully, the Court should revisit this determination in the current summary judgment posture.  The Court's analysis of statutory ambiguity focused on the overall structure of § 18004 and did not expressly discuss the multiple meanings that the term "student," "grants to students," and "financial aid" could encompass—which is consistent with the fact that the parties' underlying briefing did not address the explanation the Department offered in the IFR. *Id.* at 24.

Nor do the Court's other conclusions in its PI Order preclude finding the terms "students," "grants to students," and "financial aid" ambiguous.  For example, this Court noted that courts have "expressed skepticism where an agency attempts to impose special conditions on grants absent express authority to do so."  PI Order at 25.  But courts have not suggested that statutes providing for formula grants, like HEERF, can never contain ambiguous terms that the implementing agency might need to interpret.  *See generally* Pl. Mot. at 18–20; *City of Los Angeles v. Barr,* 41 F.3d 931, 941-42 (9th Cir. 2019); *U.S. Dep't of the Navy v. Fed. Labor*

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION
Case No. 2:20-cv-00182-TOR

9

*Relations Auth.*, 665 F.3d 1339, 1348 (D.C. Cir. 2012); *Ass'n of Civilian Technicians v. Fed. Labor Relations Auth.*, 370 F.3d 1214, 1221 (D.C. Cir. 2004). To the contrary, *City of Los Angeles v. Barr*, which the Court referenced, applied "normal rules of statutory construction" to a formula grant statute. 941 F.3d at 941–42. Where, as here, those rules of construction identify an ambiguity, *Chevron* affords agencies the authority to interpret that ambiguity in the first instance. *Brand X*, 545 U.S. at 981 ("In *Chevron*, this Court held that ambiguities in statutes within an agency's jurisdiction to administer are delegations of authority to the agency to fill the statutory gap in reasonable fashion.").

Likewise, the fact that § 18004 establishes "prescribed formulas" for distributing HEERF funds to institutions, which the Court held to be "inconsistent with [the Department's] claim of general rulemaking authority under the HEA," PI Order at 25, does not inform the meaning of the ambiguous term, nor define which students can receive assistance. Those prescribed formulas speak to distribution of money among schools, not students. *See, e.g.*, CARES Act § 18004(a)(1)-(2) (allocating money based on "full-time equivalent" students and another non-discretionary formula). Indeed, this Court recognized that not all students at the schools are eligible for HEERF funds, notwithstanding § 18004's formula provisions, when it held that that 8 U.S.C. § 1611(a) bars certain students from receiving funds. *See* ECF 63 at 12-14, 16-17. The Court's observation, *id.* 16-17, that the application of this bar ascribes different meaning to the term "students" throughout § 18004 only reinforces the notion that the terms "students," "grants to students" and "financial aid" are ambiguous, and susceptible to multiple meanings.

Washington protests that there is, in fact, no ambiguity because Congress could have, but did not, indicate that the money should be given to some students and not others—or define the term "student" to have anything other than its ordinary meaning. Pl. Mot. at 16. Of course, if Congress *had* explicitly defined "students" in section 18004(c) there would be no ambiguity. The ambiguity arises because Congress did not make clear its intent. It is therefore fair to say that Congress has not "directly spoken to the precise question at issue." *Chevron*, 467 U.S. at

842. This reading is supported by the subsequent passage of the HEROES Act, which sought to unequivocally divorce Title IV eligibility criteria from HEERF funding—and thereby confirms that the question was not resolved before. *See* H.R. 6800 § 150110(a)(1).

### B. The Interpretation the Department Articulated in the IFR is Reasonable

Because ambiguities in § 18004 constitute an implicit grant of rulemaking authority, all of Washington's arguments collapse into a question of whether the Department articulated a permissible interpretation of the statutory ambiguity in the IFR. *See generally Chevron,* 467 U.S. at 843 ("[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."); *Brand X*, 545 U.S. at 981. Simply put, that question subsumes Washington's arguments about *Skidmore* deference and arbitrariness. *See, e.g.*, *United States v. Mead Corp.*, 533 U.S. 218, 234 (2001) (explaining that *Skidmore* applies where *Chevron* does not); *Judulang v. Holder*, 565 U.S. 42, 52 n.7 (2011) ("[U]nder Chevron step two, we ask whether an agency interpretation is 'arbitrary or capricious in substance[.]'" (citations omitted)). Here, the interpretation the Department has offered in the IFR is reasonable, and easily survives review.

The IFR offers a detailed explanation for the Department's determination to interpret the term "student" as persons eligible for financial assistance under Title IV of the HEA. As the IFR explains, "an interpretation of the term 'student' . . . that [is] broad enough to cover anyone engaged in learning, or anyone enrolled in any way at an institution" would be in tension with "existing law independent of title IV"—namely, 8 U.S.C. § 1611(a), which makes the funds unavailable to persons without prescribed immigration statuses. 85 Fed. Reg. at 36,496. Likewise, such an interpretation would ignore the repeated references to Title IV throughout § 18004. *Id.* Listing out all these references, the Department concluded that it would be most cohesive to treat all § 18004 distributions as subject to the same requirements, and thus make Title IV eligibility a condition of receiving HEERF money. *Id.*

Such a rule, the Department explained, had many advantages. For one thing, Title IV eligibility is "a clear, existing standard that is familiar to the Department and to institutions and

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION
Case No. 2:20-cv-00182-TOR

11

[] allow[s] both the Department and institutions to implement the HEERF provisions in an efficient, effective, and expedient way." *Id.* at 36,497. The Department had a strong interest in "getting assistance to institutions and individuals as quickly and efficiently as possible in light of the national emergency and the immediate needs resulting" from it; using a standard that "has already been specified in great detail" would avoid a "litany of specific questions about which groups of potential students do or do not qualify," and enable institutions to use existing processes, making the task of distributing funds more expedient. *Id.* Further, the Department explained that using Title IV eligibility as a criterion would better enable "the Department to prevent potential waste, fraud, and abuse," because it would prevent "unscrupulous institutions" from using the promise of HEERF money to entice students into classes or programs that "provide[] little or no educational value." *Id.* at 36,497-98.

These detailed interpretative and policy explanations cure the problems that this Court had identified with the preliminary guidance documents that Washington challenged. PI Order at 27-28. In particular, the IFR clearly considers a variety of relevant factors and explains how they support the Department's determination. That explanation is not at all "conclusory," as Washington alleges, Pl's Br. at 14, but is instead nuanced and detailed. Meanwhile, to the extent the Department's rule represents an inconsistency with the agency's early guidance materials any such inconsistency is neither fatal nor problematic. The guidance documents that Washington references were issued at the very beginning of the Department's rulemaking process and were a non-binding, preliminary first step; those materials were not codified in any formal way, and were not a binding interpretation. The Department was free to change course in its thinking as the rulemaking process progressed, and the detailed analysis the Department ultimately offered in the IFR represents a more-than-sufficient explanation for the direction it ultimately selected.

Washington separately contends that the IFR contravenes Congress's intent "with regard to student emergency grants" under the CARES Act—which, in Washington's characterization, is that "all students are eligible for grants if their school determines they have need." Pl's Br. at

16. But Washington marshals little evidence of such a broad intent in its papers. In fact, all of Washington's arguments come down to the point that Congress used the word "student" without qualification, and did not explicitly reference Title IV eligibility in the language of § 18004. *Id.* at 16-18. But these points all merely point back to the question of whether the language of § 18004 is unambiguous. As explained in the prior section, it is not.

Moreover, Congress did not provide in § 18004 that everyone enrolled at an IHE should be given emergency relief as a means of providing financial assistance for general living expenses. Rather, emergency financial aid grants are to support students in their effort to continue their studies while facing "expenses related to the disruption of campus operations due to coronavirus." § 18004(c). Within this framework, IHEs have significant discretion over how to allocate HEERF funds among students. There is no set dollar minimum or maximum for emergency financial aid grants provided to eligible students. And there remains no barrier to IHEs using their Institutional Portion to provide coronavirus-related aid to others, provided such aid is not precluded by other applicable laws.

Taken together, all of these considerations render the IFR a reasonable interpretation of statutory ambiguity—and thus one which must be sustained.

**II. Washington's Constitutional Claims Lack Merit**

As doppelgängers to Washington's APA claims, Washington's constitutional challenges to the IFR fare no better. These arguments fail for all the reasons already discussed, and because the cases on which Washington relies bear no relation to the situation here.

Thus, in regard to its separation of powers claim, Washington relies on a case where the plaintiffs challenged an Executive Order that conditioned cities' receipt of *any* federal grant on compliance with a specific law, 8 U.S.C. § 1373, regardless of whether the grant had any connection to implementation of the law. Pl. Mot. at 30–32; *City & Cty. of S.F. v. Trump*, 897 F.3d 1225, 1232-35 (9th Cir. 2018) (concluding that an Executive Order that directs agencies "to withhold funding that Congress *has not tied to compliance with § 1373*" exceeded the President's authority (emphasis added)). Here, in contrast, the Department has explained how it is

1 interpreting an ambiguity in a statute that indisputably *does* condition the provision of federal funds for specific purposes. *See* CARES Act § 18004(c) (requiring that HEERF funds be used only in certain ways).

Likewise, Washington misses the mark in claiming that the IFR imposed by the Department contravenes the Spending Clause's requirements as articulated by the Supreme Court in *Nat'l Fed'n of Indep. Bus. v. Sebelius (NFIB)*, 567 U.S. 519, 575–78 (2012). Although Washington claims that the Spending Clause prohibits imposition of ambiguous conditions on the receipt of federal moneys, Pl. Mot. at 23-24, Washington fails to cite any case where an agency's mere interpretation of ambiguous statutory language, in a program established through Congress's exercise of its Spending Power, has been deemed to violate the Spending Clause. To the contrary, federal agencies commonly provide interpretations of the Spending Clause legislation they are charged with implementing. Finally, for all the reasons articulated above, it stretches credulity to believe that the IFR is *unrelated* to the goals of the CARES Act, as Washington claims, Pl. Mot. at 24, when all the IFR does is proceed along the path laid out by Congress by clarifying the extent of the connection between section 18004 and Title IV—a connection Congress itself made.

In fact, the IFR is not only "reasonably related to the purpose" of the CARES Act, *New York v. United States*, 505 U.S. 144, 172 (1992), but also "share[s] the same goal," *Charles v. Verhagen*, 348 F.3d 601, 609 (7th Cir. 2003)—namely, to defray *eligible* expenses of students in institutions of higher learning during a public health crisis. Washington may have a different conception of what constitutes an eligible expense. But that does not a constitutional violation make.

## **CONCLUSION**

For these reasons, Washington's motion summary judgment should be denied and judgment entered for the Defendants.

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION
Case No. 2:20-cv-00182-TOR

14

| | |
|---|---|
| DATED: January 8, 2021 | Respectfully submitted,<br><br>JEFFREY BOSSERT CLARK<br>Acting Assistant Attorney General<br>MARCIA BERMAN<br>Assistant Director, Federal Programs Branch<br><br>/s/ Alexander V. Sverdlov<br>ALEXANDER V. SVERDLOV<br>  (New York Bar No. 4918793)<br>Trial Attorney<br>U.S. Department of Justice<br>Civil Division, Federal Programs Branch<br>1100 L Street, NW<br>Tel. (202) 305-8550<br>alexander.v.sverdlov@usdoj.gov<br><br>*Attorneys for Defendants* |

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION
Case No. 2:20-cv-00182-TOR

15

**CERTIFICATE OF SERVICE**

I hereby certify that on the 8th day of January, 2021, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing.

*/s/ Alexander V. Sverdlov*
ALEXANDER V. SVERDLOV

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION
Case No. 2:20-cv-00182-TOR

16